IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,850

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL ROSS,
*Appellant*.

SYLLABUS BY THE COURT

1.

In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation.

2.

A prosecutor's clear misstatement of law constitutes prosecutorial error.

3.

A prosecutor does not shift the burden of proof by pointing out the implausibility of a defendant's account.

4.

Kansas law favors the admission of otherwise relevant evidence, and the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed July 19, 2019. Affirmed.

1

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant, and *Michael Ross*, appellant, was on a supplemental brief pro se.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

ROSEN, J.: Michael Ross challenges his convictions for first-degree felony murder, second-degree murder, and felony abuse of a child. Finding any error to be harmless, we affirm.

FACTS

On the morning of November 9, 2015, A.S. left two of her children—17-month-old G.H. and 4-year-old S.T.—in the care of her boyfriend, Ross, while she traveled to the hospital to work her shift as a certified nursing assistant. At that time, G.H. was uninjured and was acting normally, although she did have a bruise on her right cheek. Other than Ross, there were no adults in the residence at this time. Not long after her shift at the hospital began, A.S. received a phone call from Ross, who told her that G.H. had fallen and was not responding.

A.S. left work promptly after receiving the call and returned home. When A.S. arrived at the residence, G.H. was lying down on a bed. She was breathing, but she was nonresponsive. G.H. had bruising on her face and a bump on her head that had not been present before A.S. left for work. While A.S. was on the phone with 911, G.H. began having seizures.

2

Paramedics responded to the scene a short while later, where they found G.H. nonresponsive. The paramedics observed various injuries, including a large hematoma to G.H.'s forehead, a swollen upper lip, bite marks on different places of G.H.'s body, and various circular and semicircular bruises on her body that were in different stages of healing. When they moved G.H. to the ambulance, the paramedics assessed her under the Glasgow Coma Scale at a score of 4 out of a possible 15, with 15 indicating alertness. G.H.'s score decreased to a 3—the lowest possible score—during the ride to the hospital.

Eric Glendinning, M.D., provided emergency care for G.H. when she arrived at the hospital around 1:30 p.m. When she arrived, G.H. was put under anesthesia and intubated. Glendinning noted bruising on G.H.'s face and a swollen lip, along with bruising on her abdomen. A CT scan revealed a subdural hematoma and a liver laceration. Because these symptoms suggested child abuse, Glendinning consulted with a pediatric intensivist, Elizabeth Heflin, M.D. Heflin observed that G.H. had a subdural hemorrhage covering half of her brain and bilateral retinal hemorrhages in the back of her eyes, as well as several bruises across her body that were indicative of multiple impacts and what appeared to be a bite mark. Further analysis revealed that G.H.'s intracranial pressure was so high that she could not have been receiving adequate blood flow to her brain.

G.H. was declared brain dead on November 12, 2015. Following G.H.'s death, forensic pathologist Timothy Gorrill, M.D., performed an autopsy. Based on the constellation of injuries, Gorrill concluded that G.H.'s manner of death was homicide.

Wichita Police Department detectives interviewed Ross prior to G.H.'s death and subsequently took Ross into custody. Following G.H.'s death, Ross was eventually charged with premeditated first-degree murder and, in the alternative, felony murder, along with abuse of a child.

From the outset of the case to the date of trial, Ross offered a number of different explanations for G.H.'s injuries. Ross told the paramedics that G.H. had fallen from a standing position and that she had possibly fallen into a doorway. He told Wichita Police Department Detective Ryan Schomaker that he had not seen the accident but that S.T. told him G.H. had fallen. Ross later wrote A.S. a series of letters from jail that contained various descriptions of how G.H. became injured, including that G.H. fell while standing on a toilet; that she slipped on water on the bathroom floor; that she was pushed off a counter by S.T. and hit her head on a white iron chair; and that she was hit by a falling television. Ross also made multiple calls to his own mother featuring different accounts. Additionally, Ross' one-time jail cellmate Demarco Rippatoe came forward with what he alleged to be four different versions of the day's events, as relayed to him by Ross. Critically, in one of the versions Rippatoe recounted, Ross admitted to "slamm[ing]" an old, 1990s-model 32- to 34-inch television—the type "with the big back"—weighing between 65 and 70 pounds onto G.H.

At trial, Ross testified that G.H. fell off of the counter in the kitchen and hit her head on an iron chair shortly after A.S. left for work, after which G.H. "seemed fine." After this, Ross said that he lay down to sleep because he was exhausted from "coming down off crystal meth" after having been awake for "[l]ike two days and a half." Ross then claimed to have woken up after hearing S.T. and G.H. "play[ing] in the sink." Upon investigating, he found G.H. "between the tub and the toilet" and S.T. "[s]tanding on the toilet." He testified that G.H. fell again while walking to him "because there was a lot of water on the floor." Ross then went to sleep again, leaving G.H. to play with S.T. A little while later, S.T. woke Ross because "the TV's on top of [G.H.]." Again investigating, Ross found the television lying on top of G.H. "[f]rom her head to her abdomen." Ross claimed that G.H. was unconscious and was having a seizure but was also "rubbing her

4

left side where her ribs" were located. At this point, Ross "panick[ed]" and "gave [G.H.] CPR."

Both of G.H.'s treating doctors testified at trial. Glendinning estimated that the injury that caused G.H.'s brain bleeding must have occurred within a few hours before she arrived at the hospital and must have had an acute, rather than gradual, cause. As to G.H.'s lacerated liver, Glendinning opined that it would take "significant, significant force" to cause such an injury—force comparable to "car accidents at highway speeds." Glendinning further testified that a falling 65- to 70-pound television might have caused such a liver injury if it landed on G.H.'s abdomen. Heflin testified that the kind of hemorrhage G.H. suffered—a subdural hemorrhage—usually occurs "when the skull goes one way, the brain goes the other way and it rips them apart, rips those veins apart." Heflin said that with subdural hemorrhage, "you don't get a lucid interval" between injury and presentation of symptoms. Heflin opined that a falling television could not have caused subdural hemorrhages and retinal hemorrhages. Heflin testified that retinal hemorrhages "are usually caused by some kind of violent shaking event where the head is shaken and goes in multiple directions." Heflin opined that a child of S.T.'s size could not have been the source of G.H.'s injuries, nor could "[t]he routine bumps and bruises that most toddlers get as they run into" furniture or fall onto the floor. In Heflin's opinion, G.H.'s injuries were inflicted, rather than accidental in origin.

The State focused its case on the severity of G.H.'s injuries and the inconsistency of Ross' proffered explanations for those injuries. Among other things, the State presented the recorded jail calls between Ross and his mother. Rippatoe also testified regarding the various accounts Ross allegedly gave him of the events of November 9, 2015. Notably, during closing arguments, the State told the jury it "must find [Ross] guilty" if it did not believe his testimony.

5

Although Ross' counsel initially wanted no lesser included offense instructions, the district court sua sponte decided to give intentional second-degree murder as a lesser included offense to premeditated first-degree murder. As a result, Ross' counsel also sought an unintentional but reckless second-degree murder instruction. The district court rejected this request. In closing, Ross' trial counsel argued that Ross had simply been, at most, negligent and that G.H. had been caught in a "perfect storm" of accidental injuries that culminated in her death.

The jury convicted Ross of both felony murder and second-degree murder as a lesser included offense of premeditated murder, along with abuse of a child. The district court sentenced Ross to life in prison with no chance of parole for 25 years for the felony-murder conviction and 55 months in prison for the abuse of a child conviction, to run consecutive.

Ross filed a timely appeal.

ANALYSIS

Ross' counsel raises four issues for this court's consideration. Ross has raised an additional two issues in a pro se brief. We find that none of these issues warrant reversal of Ross' convictions.

*Prosecutorial Error*

Ross first claims that the State committed prosecutorial error when, during its rebuttal closing argument, one of the prosecutors stated:

"Did you really believe the defendant's testimony? Ask yourself, is an unconscious baby going to be able to hold her ribs? What did you believe of his testimony? *Because if you didn't believe it, you must find him guilty*." (Emphasis added.)

Ross argues this was prosecutorial error that prejudiced his right to a fair trial because this statement was legally incorrect and shifted the burden to Ross to prove his own innocence.

This court reviews a claim of prosecutorial error under a two-step analysis:

"[T]he appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018). A prosecutor's misstatement of law constitutes prosecutorial error. *State v. Davis*, 306 Kan. 400, 413, 394 P.3d 817 (2017).

Every criminal defendant has a constitutional right to the presumption of innocence. *Ward*, 292 Kan. at 570. Consequently, a jury may find a defendant guilty *only*

if the State proves the defendant's guilt; the defendant is under no obligation to disprove the State's charge. K.S.A. 2018 Supp. 21-5108 (burden to prove guilt is on State). The complained-of sentence here—"Because if you didn't believe [Ross' testimony], you must find him guilty"—conflicts with these principles and inaccurately represents the law. As a result, it was error.

But our analysis does not end here. We must evaluate whether Ross was prejudiced by this erroneous statement. Ross avers that this statement prejudiced his right to a fair trial because it effectively relieved the State of its burden to prove guilt. Although we have concluded that the literal wording of the statement conveyed such a message, the surrounding context of the prosecutor's comments makes clear that it did not have this effect.

The prosecutor made this comment after listing much of its evidence against Ross—including the fact that he was the only adult with G.H. when she was injured, the medical testimony about G.H.'s injuries, and the doctors' opinions that those injuries were not accidental. She then informed the jury that if it did not believe Ross' testimony, it had to find him guilty. She followed this with a description of the alternative explanations Ross gave for G.H.'s injuries and an argument regarding the implausibility of those explanations. Within this context, the prosecutor's statement is much more innocuous. The prosecutor laid out the evidence it thought proved Ross' guilt and then pointed out Ross' failure to poke any holes in that evidence. Understood in this light, the prosecutor's statement did not instruct the jury to find Ross guilty if he failed to prove his innocence; it instructed the jury to find him guilty if it found the State's evidence compelling and Ross' rebuttal of that evidence unbelievable. A later statement from the prosecutor confirms this position:

"Think about that in this context. The evidence is overwhelming of the defendant's guilt, overwhelming. But he wants you to think it's just these freak accidents, all caused by a four-year-old who happened to be there at every single accident in less than two hours, but the defendant wasn't there for any of it, didn't do any of it. That's what he wants you to believe."

The prosecutor's comment did not inform the jury that Ross had a burden to prove innocence. It stressed the State's position that Ross' testimony had not successfully discredited the State's evidence. A prosecutor does not shift the burden of proof by highlighting the implausibility of a defendant's account. See *State v. Williams*, 299 Kan. 911, 940, 329 P.3d 400 (2014). Because the prosecutor's misstatement did not effectively shift the burden of proof, there was no reasonable possibility that the error contributed to the verdict, and Ross suffered no prejudice. This was not reversible error.

*Absence of a Jury Instruction on Reckless Second-Degree Murder*

Ross next argues that the district court violated his statutory right to lesser included offense instructions when it did not offer an instruction on unintentional but reckless second-degree murder as a lesser included offense of premeditated murder. Appellate courts perform a four-step review of challenges to jury instructions:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *Ward*[, 292 Kan. at 565]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

9

The first element of this analysis ultimately affects the last one "in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible." *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015). Because Ross' trial counsel requested the instruction, any error here is harmless only if "there is no reasonable probability that the error will or did affect the outcome of the trial." *Ward*, 292 Kan. at 565.

The parties agree that unintentional but reckless second-degree murder under K.S.A. 2018 Supp. 21-5403(a)(2) is a lesser included offense of premeditated first-degree murder and was, therefore, legally appropriate. They dispute whether such an instruction was factually appropriate. On this point, Ross relies almost entirely on the testimony of his former cellmate Rippatoe, who testified as a State witness. Ross argues that, if the jury believed Rippatoe's account, it could have found that Ross "slammed" the television onto the 17-month-old G.H. without the intent to kill her, but with the intent to cover up his other physical abuse by making it appear as though the falling television had caused G.H.'s injuries.

Whether this instruction was factually appropriate is immaterial, because we have little difficulty concluding that any error in failing to offer the instruction was harmless. We do not believe the jury could have reasonably viewed the act Rippatoe described— "slamm[ing]" an old style, 32- to 34-inch, 65- to 70-pound television on top of a 17-month-old child—as anything other than an intentional act calculated to bring about death. See *State v. Cheffen*, 297 Kan. 689, 704, 303 P.3d 1261 (2013); *State v. Barnes*, 293 Kan. 240, 264, 262 P.3d 297 (2011) (quoting *State v. Salcido-Corral*, 262 Kan. 392, 398, 940 P.2d 11 [1997]) (recognizing that a fact-finder may infer intent from "'acts, circumstances, and inferences reasonably deducible therefrom'"). This is particularly true given Rippatoe's description of Ross' conduct after "slamm[ing]" the TV down on G.H.,

10

i.e., watching as G.H.'s sister tried to lift the TV off of G.H. before "finally" doing it himself. The jury also heard testimony about the degree of harm such an object could cause to a young child and medical testimony that even a falling TV "would not have caused the cerebral edema, subdural hemorrhages, and the retinal hemorrhages that this child had." The evidence regarding the degree of harm G.H. suffered was overwhelming. Based on this evidence, there is no reasonable probability that the jury could have inferred that the killing of G.H. was done unintentionally but recklessly. Any error in failing to offer a lessor included offense instruction on unintentional but reckless second-degree murder was harmless.

*Admission of Ross' Jail Calls*

Ross next challenges the district court's decision to admit two recorded jail calls between himself and his mother into evidence. Ross' trial counsel raised this objection under K.S.A. 60-445, thus preserving it for appellate review.

A district court may exclude evidence if it determines that the evidence's probative value is "substantially outweighed" by its prejudicial effect. K.S.A. 60-445; see also *State v. Huddleston*, 298 Kan. 941, 961, 318 P.3d 140 (2014). That said, "Kansas law favors the admission of otherwise relevant evidence, and the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly. [Citation omitted.]" *State v. Seacat*, 303 Kan. 622, 640, 366 P.3d 208 (2016). "On appeal, this determination is reviewed under an abuse of discretion standard, and the burden of proof is on the party alleging that the discretion was abused. [Citation omitted.]" *Huddleston*, 298 Kan. at 962. As this court has repeatedly held:

"'Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, i.e., if the discretion is guided by an erroneous legal

11

conclusion; or (3) is based on an error of fact, i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.'" *State v. Woodring*, 309 Kan. 379, 380, 435 P.3d 54 (2019) (quoting *Ward*, 292 Kan. 541, Syl. ¶ 3).

Ross acknowledges that the two calls were relevant to the events surrounding G.H.'s death but claims they were not probative because they merely reiterated the various other versions of events Ross gave to others. He also claims the admission of these two calls unfairly prejudiced him because they suggested to the jury that Ross' own mother did not believe his version of events, thereby implying that the jury, likewise, should not believe him. The State counters by emphasizing the importance of Ross' various, constantly evolving explanations to the State's theory of the case, i.e., that Ross did serious violence to G.H. and then tried to pass her injuries off as the product of one or more accidents.

We see no abuse of discretion on the district court's part. The differences between the explanations offered by Ross in the first call and the second call were helpful pieces of evidence. In the first call, Ross claims that S.T. told him that G.H. fell and hit her head on a door, although he emphasized that he was not in the room at the time. In the second call, Ross' explanation included a more involved explanation: he claimed that G.H. and S.T. were alone in the bathroom, and he heard G.H. fall onto the toilet. Ross claimed to have then entered the bathroom and seen G.H. crying; G.H. then got up, was "fine," and started walking over to him, but then slipped and fell. At this point, Ross claimed that G.H. started "heaving," so Ross initiated CPR. Nevertheless, Ross told his mother, G.H. went into shock and was "holding her ribs and everything."

Given the State's theory that Ross' explanations grew more elaborate as the true severity of G.H.'s injuries became apparent, the differences in Ross' stories between the

two calls carried significant probative value. This evidence was not cumulative; even if Ross gave similar versions—albeit with varying details—to other individuals, as Ross claims, the call recordings provide useful meta-information to a fact-finder that raw testimony alone could never effectively convey. Among other things, the calls reveal Ross' tone, his vagueness, and the shifting nature of his accounts of the morning's events—all of which fit into the State's greater theory of the case, as emphasized in its closing argument:

"Go back and listen to State's 98 and 99. It's probably difficult to hear what [Ross] was saying in those calls . . . . Listen to the words. Because the mom yelling kind of overshadowed everything else, but listen for his words. Listen for the changes in his statements over and over and over and over.

"If it's an accident, it doesn't change. It's the same accident all the time. Maybe it is freakish, but it's the same thing. The reason that it changes over and over and over is because it was never an accident. He had to try out different versions of his statement to different people. When he found out what the different injuries were showing up to be, it evolved. It went from don't know what happened, [G.H.]—[S.T.] tells me she ran into a door. That's story number one to the police: Don't know what happened, [S.T.] just tells me she ran into a door, we'll go with that at first.

"Then he starts to find out just how badly she's hurt and now the mechanisms of injury of what really happened start to show up over time. Listen to those tapes. Look at all of the evidence. Is it intentional? He was the only adult there. He was the only one there with the force necessary to cause the mechanisms of injury that hurt this baby."

We agree that the two calls were likely prejudicial to Ross. The emotion in Ross' mother's voice and the frequently accusatorial nature of her responses to him are undeniable. But prejudice alone is not enough to warrant the application of the "extraordinary remedy" to exclude evidence. See *Seacat*, 303 Kan. at 640. Instead, such a

13

remedy is only appropriate when the probative value of the evidence is "substantially outweighed by unfair prejudice." *State v. Mitchell*, 285 Kan. 1070, 1074, 179 P.3d 394 (2008). That was not the case here. The probative value of the calls far outweighed the resulting prejudice. Consequently, the district court did not err in admitting the calls.

*Ross' Pro Se Arguments*

In a separate pro se brief, Ross raises a pair of additional issues. He first claims that the jury's verdict on second-degree murder "operates as a de facto acquittal" on the charge of first-degree felony murder. He also argues that K.S.A. 2018 Supp. 21-5109(b)(1) infringes on his right to present a "complete defense" to the State's charges, an error he contends is structural. Specifically, Ross claims that the Legislature, by providing that there are no lesser degrees of felony murder, unconstitutionally precluded him from presenting a "'guilt-based'" defense to the charge of felony murder.

It does not appear that Ross raised either argument before the district court. As a general rule, an issue not raised before a district court cannot be considered for the first time on appeal. *Trotter v. State*, 288 Kan. 112, 124, 200 P.3d 1236 (2009). Ross does not acknowledge his failure to preserve these issues for review and provides no explanation for why this court should consider them, as required by Kansas Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34). In light of Ross' failure to explain why we should consider his newly raised arguments, they are insufficiently preserved for appellate review.

*Cumulative Error*

Finally, Ross argues that the cumulative effect of the errors in this case deprived him of a fair trial.

14

Although errors may be individually harmless, their collective effect "'may be so great as to require reversal of a defendant's conviction.'" *State v. Anderson*, 308 Kan. 1251, 1266, 427 P.3d 847 (2018) (quoting *State v. Carter*, 305 Kan. 139, 166, 380 P.3d 189 [2016]). When analyzing a claim of cumulative error, we use a de novo standard of review to determine whether "'the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error.'" *Anderson*, 308 Kan. at 1266 (quoting *State v. Brown*, 298 Kan. 1040, 1056, 318 P. 3d 1005 [2014]). Cumulative errors are not prejudicial when "'the evidence against the defendant is overwhelming.'" *Anderson*, 308 Kan. at 1267 (quoting *Carter*, 305 Kan. at 166).

In our review, we have identified one error based on the prosecutor's misstatement of law and have assumed one error based on the district court's failure to issue a lesser included offense instruction on unintentional but reckless second-degree murder. We have concluded that the prosecutorial error did not prejudice Ross' right to a fair trial and that any instructional error was harmless. Though aggregate harmless errors may constitute reversible error overall, they did not do so here. The evidence against Ross was overwhelming, and his explanation and defense against that evidence changed numerous times. We can say, beyond a reasonable doubt, that the jury's verdict would not have changed even if the error and assumed error had not been present. Consequently, Ross was not denied a fair trial and his cumulative error claim fails.

CONCLUSION

We affirm the judgment of the district court.

15