NOT DESIGNATED FOR PUBLICATION

No. 121,173

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DYLAN JAY KILLINGSWORTH,
*Appellant*.


MEMORANDUM OPINION

Appeal from Saline District Court; RENE S. YOUNG, judge. Opinion filed February 26, 2021.
Affirmed in part and reversed in part.


*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.


*Brock R. Abbey*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GARDNER, P.J., SCHROEDER, J., and WALKER, S.J.


PER CURIAM: Dylan Jay Killingsworth appeals his convictions at a jury trial for
leaving the scene of an accident resulting in injury and for driving without a valid driver's
license. These charges arose from a hit-and-run accident. Killingsworth's primary defense
was that he did not know he had been involved in a collision and because he did not
know he was in a collision he could not be guilty of leaving the scene of an accident. On
appeal Killingsworth argues:  that the prosecutor erred by telling the jury that
Killingsworth did not need to know he was in an accident to sustain a conviction for
leaving the scene of an accident; that the district court erred by allowing the State, mid-
trial, to amend his charge for driving while suspended to driving without a valid license;

that the district court also erred by refusing to give a no-sympathy instruction when the victim was permitted to sit in the courtroom after testifying; and that the cumulative effect of these errors denied him a fair trial. Although our analysis reveals two errors on the charge of leaving the scene of an injury accident, we ultimately conclude that the errors were harmless, and the cumulative effect of these two errors did not deny Killingsworth a fair trial. We affirm his conviction for leaving the scene of an injury accident.

However, we also find the district court improperly allowed the State to amend the second charge from driving while suspended to driving with no valid driver's license. This resulted in a violation of Killingsworth's right against being placed in double jeopardy, hence his conviction for driving with no valid driver's license must be reversed. Therefore, we affirm in part and reverse in part.

FACTS

Tracy Thummel left work around 5 p.m. on June 12, 2017, and was on her way to the Dollar General store in Salina. She was driving south on Broadway as she neared the entrance to the store's parking lot. Thummel activated her turn signal to make a right turn and slowed down. That was the last thing she remembered before waking up to a man, Saline County Sheriff's Deputy Aaron Schriner, asking her if she was okay and informing her that she had been in a serious car accident.

Deputy Schriner was leaving a restaurant across the street from the Dollar General when he witnessed a truck drive into the back of a car. He ran back into the restaurant to tell someone to call 911. When he went back outside, he did not see the truck. Deputy Schriner went to Thummel and rendered aid. Thummel was unconscious when he arrived.

2

When Thummel awoke, she was bleeding, and there was blood on her clothing. She noticed cuts on her hands. The impact of the collision caused Thummel's blue Ford Focus to travel through the front lawn of Dollar General, over two cement embankments, and into the parking lot of a towing company next to Dollar General, striking a parked car.

Police and EMS arrived at the scene. Thummel decided not to take an ambulance to the hospital because she was concerned about the cost. However, later her husband took her to the hospital. After a CT scan revealed bleeding in Thummel's brain, she was kept overnight for observation. When CT scans were completed the next morning which showed no expansion of the hemorrhage, Thummel was discharged from the hospital with strict head injury instructions.

Thummel returned to the emergency room two days later with a severe headache and confusion. One week after the collision, the hemorrhage was resolved. However, Thummel continued to have neck spasms, memory issues, and pain in her back, hips, and right leg. At the time of Killingsworth's jury trial, Thummel was still having memory issues, muscle spasms, and pain. She also had to use a cane to walk, which she did not have to use before the collision.

Salina Police Officer Alvin Loreto spoke to two witnesses at the scene of Thummel's crash—William Bartunek and Kenneth Hines. Bartunek had been driving behind Thummel before the collision. When Thummel signaled that she was turning in to the Dollar General, Bartunek moved his vehicle into the left lane. Then, he heard a "tremendous crash" next to him as Thummel's car was hit from behind. Bartunek reported to Officer Loreto that a white Ford truck hit Thummel's car and that he had seen the truck go into the employee entrance area behind Kansasland, a tire company nearby. Bartunek continued down the road until he could turn around and return to the scene.

Hines also spoke to Officer Loreto about events he had observed. Hines indicated he was leaving his house to meet his wife at Dollar General, which was about a block away, when he saw a white Ford truck with heavy front-end damage quickly pull up to the house across the street from his residence. Hines also saw someone take the license plate off the Ford and put it on an older truck. Hines proceeded to Dollar General, and after going inside to get a drink, he was approached by the police officers investigating the accident. Hines told Officer Loreto about the truck. When Hines and his wife returned to their house, the truck was gone. However, Hines saw the same driver park a different truck there later that evening.

Officer Loreto went to the address that Hines provided and saw a white GMC truck parked there. He called in the tag and saw that the registered owner of the vehicle was Killingsworth. Officer Loreto did not see any damage on the GMC truck.

Salina Police Detective Tim Brown visited Killingsworth's residence on June 26, 2017. He observed a white Ford truck parked beside the house without a license plate. It was boxed in on three sides by the house and the fence, and a white GMC truck was parked behind it. Detective Brown was able to make his way to the front of the truck where he viewed damage to the hood and passenger side light. He also observed blue paint transfer on the truck.

Detective Brown then spoke with Killingsworth about the June 12, 2017 collision. Killingsworth admitted that he was driving south on Broadway that day around 4:45 p.m. He said that his cell phone slipped off the seat of his truck and he reached down to grab it. As he looked up, he saw a white car in front of him move to the left lane. Killingsworth told Detective Brown he then heard a bang and thought he had run something over. But he said whatever it was did not slow him down. Killingsworth pulled into the Kansasland tire property to inspect his truck. He saw that there was damage to his light and grill, but when he looked down Broadway he did not see anything that may

4

have caused the damage. Killingsworth also told Detective Brown that he called the police to report an accident, but their systems were down so he could not file an accident report. Killingsworth provided Detective Brown with a written statement.

Detective Brown noticed that the vehicle insurance information provided by Killingsworth showed an effective date of June 13, 2017—the day after the collision. Additionally, he noted that the sticker on the tag which Killingsworth had on the Ford truck on the day of the collision did not match the vehicle registration. The truck's registration had expired in April 2017. When asked for a driver's license, Killingsworth produced a state identification card with his driver's license number on it. Detective Brown explained at trial that an identification card alone does not allow a person to drive a vehicle.

Killingsworth's testimony at trial was reasonably consistent with what he had told Detective Brown. He added that after calling 911 to report the accident and being told their systems were down, he went online to make a police report. Killingsworth testified that this was also unsuccessful, so he called the police department and asked for an officer to come take a statement. At trial, the State presented evidence that no calls were placed to 911 during the relevant time period from either of Killingsworth's phone numbers and that the 911 system was not down or inoperable on June 12, 2017. Detective Brown also testified that no one reported an accident to the police on June 12, 2017.

The State charged Killingsworth with failing to stop and remain at the scene of an accident resulting in great bodily harm; driving with a cancelled, suspended, or revoked license; failing to provide proof of liability insurance; following another vehicle too closely; and a vehicle registration violation.

On the second day of trial, the district court denied the State's request to admit Killingsworth's driving record on the basis that it was incomplete. The State was relying

5

on this record to prove the driving while suspended charge. In response, the State moved to amend the driving while suspended charge to driving without a valid driver's license. The district court permitted the amendment.

The jury found Killingsworth guilty of leaving the scene of the accident resulting in great bodily injury and of driving without a valid license. Killingsworth pled no contest to failing to provide proof of liability insurance, and the district court found him guilty of the remaining charges. On the charge of leaving the scene of an accident, the district court imposed a controlling sentence of 19 months' imprisonment followed by 12 months' postrelease supervision. Killingsworth has timely appealed from his jury convictions and sentences.

ANALYSIS

On appeal, Killingsworth has four areas of complaint about his trial. We will consider each of these in turn.

*The district court's refusal to give the jury a no-sympathy instruction*

For his first issue on appeal, Killingsworth contends that the district court erred by refusing to give the jury an instruction not to use sympathy for Thummel during its deliberations.

During the jury instructions conference, Killingworth's counsel requested a no-sympathy instruction consistent with the language of the Pattern Instructions for Kansas (PIK) Civ. 4th 102.05. This instruction provides: "You must decide this case without favoritism for or prejudice against *(either) (any)* party. Sympathy should not influence your decision." PIK Civ. 4th 102.05. An earlier version of PIK Criminal formerly contained an instruction like the one Killingsworth requested. PIK Crim. 2d 51.07.

6

However, the third edition of PIK Criminal noted that the instruction was disapproved of for general use. PIK Crim. 3d 51.07 (2000 Supp.). In fact, a no-sympathy instruction does not appear at all in the fourth edition of PIK Criminal, which is the most recent edition. Here, the district court ruled that the no-sympathy instruction was not appropriate and denied the defense request. Killingsworth now argues that this was error.

When reviewing jury instruction issues, we employ a three-step process: (1) determining whether the issue was properly preserved, (2) considering the merits of the claim to decide whether error occurred below, and (3) assessing whether the error requires reversal. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). Killingsworth properly preserved the issue by requesting the instruction. Therefore, we will consider the merits of his claim to determine whether the district court erred in refusing to give the no-sympathy instruction. In performing this analysis, we "consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012).

Our Supreme Court has previously held that the no-sympathy instruction can be legally appropriate in certain cases. *State v. Williams*, 299 Kan. 1039, 1044, 329 P.3d 420 (2014). However, it has cautioned that a district court should not use a no-sympathy instruction "except under very unusual circumstances." 299 Kan. 1039, Syl. ¶ 1. Thus, the question is whether Killingsworth's case presents very unusual circumstances warranting an instruction. In answering this question, we must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant, that would have supported the instruction. 299 Kan. at 1043.

Killingworth argues that the instruction was appropriate because Thummel was permitted to sit in the courtroom during the trial and watch the proceedings after she testified. Killingsworth's counsel raised concerns to the district court as to the potential sympathy that might be created by Thummel's presence in the courtroom. Killingsworth

7

argues that because Thummel testified about her injuries and ongoing struggle with pain, her presence in the courtroom constantly reminded the jury of her ongoing medical issues. He concludes that this is the type of "unusual circumstance that creates the potential for improper impact of sympathy that the requested jury instruction seeks to mitigate."

There are numerous situations where Kansas appellate courts have upheld district court decisions not to provide a no-sympathy instruction. During a murder trial in *State v. Holmes*, 278 Kan. 603, 102 P.3d 406 (2004), one or two members of the victim's family began crying and were escorted out of the courtroom. The district court denied the defendant's request for a no-sympathy instruction, and the Kansas Supreme Court affirmed its decision. 278 Kan. at 635-36; see also *State v. Reser*, 244 Kan. 306, 316-17, 767 P.2d 1277 (1989) (finding that no-sympathy instruction was necessary where defendant was convicted of multiple counts of rape and sodomy against his 14-year-old stepdaughter, despite defendant's argument that instruction was necessary because of disparity in size and age between himself and victim and because crimes occurred in small town where it was likely jurors would know victim and defendant); *State v. Sully*, 219 Kan. 222, 226, 547 P.2d 344 (1976) (finding that no-sympathy instruction was necessary where multiple photos of gunshot victim depicting bullet wounds were shown to jury).

Although a no-sympathy instruction was not at issue on appeal in *State v. Rhone*, 219 Kan. 542, 548 P.2d 752 (1976), it is often cited as an example of the unusual circumstances which might warrant such an instruction. See, e.g., *Williams*, 299 Kan. at 1044; *Holmes*, 278 Kan. at 635-36. In *Rhone*, the jury had to travel to the victim's home to hear her testimony because she was too ill with cancer to testify in court. The district court gave a no-sympathy instruction to the jury, which went uncontested on appeal. Another example arose in *Williams*, where the defendant argued that the district court erred by granting the State's request for a no-sympathy instruction. The district court

explained that it rarely gave the instruction, but felt it was warranted in that case because the defendant repeatedly cried on the witness stand, acted very emotional in front of the jury throughout the trial, and broke down in the courtroom multiple times each day. Deferring to the district court's observation of demeanor in the courtroom, the Kansas Supreme Court approved of the district court's use of the instruction. 299 Kan. at 1045.

Killingsworth asserts his case is similar to *Rhone* and *Williams*. However, we believe Killingsworth's case simply does not present sufficiently unusual circumstances to find that the district court erred in refusing to give the requested no-sympathy instruction. There is nothing unusual about a victim attending a trial. There is no indication in the record that Thummel had any emotional outbursts or otherwise drew unwarranted attention to herself. Finally, when looking at the jury instructions as a whole it can be seen that the court instructed the jurors that it was their responsibility to determine the weight and credit to be given to the testimony of each witness, that they had the right to rely upon common knowledge and experience with respect to matters about which a witness had testified, and that they must decide the case by applying the instructions to the facts as they found them. There is no indication that the jury failed to follow these instructions.

In our opinion, the no-sympathy instruction was not factually appropriate here. Accordingly, we find the district court did not err in refusing to give the requested instruction to the jury.

*Allegations of prosecutorial error*

In his second argument on appeal, Killingsworth contends that the prosecutor erred in closing argument by misstating the proper mental state for the crime of leaving the scene of an accident resulting in injury.

We use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109.

During closing arguments, one of Killingsworth's defenses was that he did not have a reason to know he was in an accident. Thus, he contends he could not be guilty as charged. Defense counsel framed the issue for the jury as whether Killingsworth knew or should have known that he was involved in an accident causing great bodily injury. During his rebuttal, the prosecutor referred to the jury instruction on leaving the scene of the accident. The jury was instructed by the court:

> "Instruction Number 2: The defendant is charged in Count 1 with leaving the scene of an accident resulting in injury. The defendant pleads not guilty.
> "To establish this charge, each of the following claims must be proved: 1.) The defendant was the driver of a vehicle involved in an accident; 2.) The accident resulted in great bodily harm to a person; 3.) The defendant knowingly failed to stop as close to the scene of the accident as possible and then immediately return to the scene and remain until information required by law was reported to a law enforcement officer or any person injured in the accident; 4.) This act occurred on or about the 12th day of June, 2017, in Saline County, Kansas."

Killingsworth did not object to the instruction. The instruction is consistent with PIK Crim. 4th 66.111 (2014 Supp.), with the exception that the word "knowingly" was inserted by the court into the third element of the offense.

In the context of discussing this instruction, the prosecutor made the comment at issue in this appeal:

> "The third element for that offense is the defendant knowingly failed to stop as close to the scene of the accident as possible and then immediately return to the scene and remain until the information is provided. That third element is the one that we have to show and prove [was] knowingly done. Not that he knew he was involved in an accident, not that he knew about the great bodily harm to another person, but that he knowingly failed to stop or go back to the scene to report the information. So that's coming from Instruction 2."

Killingsworth asserts that this constituted prosecutorial error because it misstates the law. He acknowledges that the State is not required to prove that he had knowledge of injury or the severity of the injury, but he argues that "knowledge about having been in an accident at all[] is an essential element of the offense." The State replies that it was not required to prove that Killingsworth knew he was the driver of a vehicle involved in an accident. However, if there was error the State asserts it was harmless and does not require reversal.

"[A] culpable mental state is an essential element of every crime." K.S.A. 2019 Supp. 21-5202(a). The statute prescribing the elements of leaving the scene of an accident resulting in injury, K.S.A. 2019 Supp. 8-1602(a), does not contain a mental state. It states:

> "The driver of any vehicle involved in an accident resulting in injury to, great bodily harm to or death of any person or damage to any attended vehicle or property shall

11

immediately stop such vehicle at the scene of such accident, or as close thereto as possible, but shall then immediately return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of K.S.A. 8-1604, and amendments thereto." K.S.A. 2019 Supp. 8-1602(a).

Where "the definition of a crime does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." K.S.A. 2019 Supp. 21-5202(d). When a mental state is required in these situations, "'intent,' 'knowledge' or 'recklessness' suffices to establish criminal responsibility." K.S.A. 2019 Supp. 21-5202(e).

The State asserts it properly included a mental state in the charging document by alleging that Killingsworth "knowingly failed to stop" and return to the scene of the accident. Therefore, it did not have to prove that Killingsworth knew he was in an accident. But the State also acknowledges that in analyzing a similar statute in *State v. Wall*, 206 Kan. 760, 764, 482 P.2d 41 (1971), the Kansas Supreme Court held knowledge of an accident was "an essential element of the offense of hit and run driving." However, the State argues that *Wall* is not applicable here because it was decided prior to the 2011 recodification of Kansas' criminal laws. We find this argument to be unpersuasive.

In *Wall*, the Kansas Supreme Court analyzed a statute that was substantively similar to K.S.A. 2019 Supp. 8-1602(a). The court noted: "[The statute] contains no express requirement that knowledge on the part of a motor vehicle operator that he has been in a collision is necessary to sustain a conviction for its violation; however, we believe such showing is essential." *Wall*, 206 Kan. at 764. Because the statute requires a driver to stop and furnish information to anyone who may have been injured, implicit within the statute "must be the element of recognition or awareness on the part of that driver of the fact of the collision." 206 Kan. at 764. The Supreme Court could not "believe the legislature intended a penalty to be imposed for failing to follow that course

12

of action if a driver was in fact unaware of the occurrence of collision." 206 Kan. at 764. The court explained that the State need not prove that the defendant had actual knowledge of a collision and added that the State could establish a defendant's knowledge through circumstantial evidence. It is "sufficient if the circumstances are such as to induce in a reasonable person a belief that collision has occurred; otherwise a callous person might nullify the humanitarian purpose of the statute by the simple act of immediate flight from an accident scene without ascertaining exactly what had occurred." 206 Kan. at 764.

We believe there is no valid reason to disregard *Wall* simply because the statute on leaving the scene of an accident was recodified. The operative statutory language is the same, and the reasoning is just as applicable under the new statute as it was in *Wall*. Further, a panel of our court has reaffirmed the holding of *Wall* since the recodification. See *State v. Heironimus*, 51 Kan. App. 2d 841, 850, 356 P.3d 427 (2015) (holding that State must prove that person had knowledge that accident occurred to sustain conviction for leaving scene of injury accident in violation of K.S.A. 2011 Supp. 8-1602[a]).

*Heironimus* presented facts somewhat similar to those in this case. Robby Heironimus struck a jaywalking man with the right brake pedal of his motorcycle. It was night, and the pedestrian was wearing black clothing and had long, dark hair. After being struck, the victim's leg had to be amputated and he had a permanently dislocated bone in his left hand. The driver of the motorcycle, Heironimus, felt something hit his right foot while he was on his motorcycle but only realized that someone had been injured after reading an article about it and speaking to others. One of the charges the State filed against Heironimus was leaving the scene of an injury accident.

At trial, Heironimus requested a jury instruction on the mental state for leaving the scene of an injury accident. The State argued that it was a strict liability offense, and the district court agreed with the State. On appeal, Heironimus argued that the district court

13

committed an error of law by allowing the State to prosecute him without proving his intent. A panel of our court agreed, holding that a person must have knowledge that an accident occurred to sustain a conviction for leaving the scene of an injury accident. Therefore, the district court erred by not giving the requested mental state instruction. 51 Kan. App. 2d at 850-52.

Having found error, the Court of Appeals panel in *Heironimus* had to determine whether the error was harmless. 51 Kan. App. 2d at 851-52. The court noted that an error in omitting an element of an offense in jury instructions is harmless where there was overwhelming evidence to support the omitted element. 51 Kan. App. 2d at 852. The panel concluded that there was not overwhelming evidence to support a finding that Heironimus knew he was in an accident, so the error was not harmless. The panel reversed and remanded the case for a new trial. 51 Kan. App. 2d at 853.

Thus, applying the principles in *Wall* and *Heironimus* leads to the conclusion that the prosecutor erred when he stated that the State was not required to prove that Killingsworth knew he was in an accident. "A prosecutor's clear misstatement of law constitutes prosecutorial error." *State v. Ross*, 310 Kan. 216, Syl. ¶ 2, 445 P.3d 726 (2019). Consequently, we must now engage in a harmless error analysis. To prevent reversal of Killingsworth's conviction, the State has the burden of demonstrating beyond a reasonable doubt that the prosecutor's misstatement of the law did not affect the outcome of the trial. See *Sherman*, 305 Kan. at 109.

While this case has factual similarities to *Heironimus*, it does not necessarily compel the same result because there are also some important differences. First, even if the prosecutor had not made the statement at issue, the jury would have heard the prosecutor's version of the law in the jury instructions. The instructions did not inform the jury that it was required to find that Killingsworth had knowledge of the accident.

14

Killingsworth did not challenge the instructions as given or request a mental state instruction as in *Heironimus*.

Second, the evidence is much more compelling here than in *Heironimus*. In *Heironimus*, the accident occurred at night and the victim was wearing black. Witnesses reported that even they did not notice the victim until after the collision. There were no such vision problems here. Killingsworth was driving in daylight on a fairly busy road. Also, Killingworth's collision with Thummel caused a large crash. Killingsworth told Detective Brown that he heard a bang and thought he had run over something, even though it did not slow him down.

Unlike Heironimus, Killingsworth was concerned enough about the incident to stop and inspect his truck. The damage to Heironimus' motorcycle was negligible when compared to Killingsworth's truck, which included a cracked headlight and dented hood. Another indicator that Killingsworth knew he had been in an accident was the fact that he claimed to have attempted making an accident report three times (although the State presented evidence that put the veracity of this claim into question). Finally, he took evasive action after the collision by changing his license plate and parking his damaged truck in a manner that would make it impossible to see the damage from the street. We find these circumstances to be sufficient "to induce in a reasonable person a belief that collision has occurred." *Wall*, 206 Kan. at 764.

The prosecutor clearly erred when he misstated the law to the jury. However, we conclude that this error was harmless because the jury would have received the same information through the jury instructions to which Killingsworth did not object. This conclusion, when coupled with the State's strong circumstantial evidence indicating that a reasonable person in Killingsworth's shoes would have been aware he had been in a collision, convinces us that the prosecutor's misstatement of the law did not affect the outcome of the trial.

*The State's mid-trial amendment of the driving while suspended charge to driving without a valid driver's license*

Next, Killingsworth alleges the district court erred by permitting the prosecutor to amend the charge of driving while suspended. On the second day of trial, the district court allowed the State to amend the charge of driving on a suspended license to driving without a valid driver's license. Killingsworth asserts that the district court erred in permitting the amendment because a complaint may only be amended if a different crime is not charged, and driving on a suspended license is a different crime than driving without a valid license.

The State concedes that it was error to amend the complaint. See K.S.A. 22-3201(e) ("The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced."); *State v. Armstead*, No. 108,533, 2014 WL 349561, at *5 (Kan. App. 2014) (unpublished decision) (explaining why driving with suspended license is different crime than driving without valid driver's license). But the State suggests that the appropriate remedy is to remand the case for a new trial on the original driving while suspended charge. Killingsworth did not reply to this suggestion.

Remand for a new trial on the original charge raises double jeopardy concerns. A case very similar to ours which dealt with such double jeopardy issues is *City of Hutchinson v. Jackson*, No. 113,343, 2015 WL 9459773 (Kan. App. 2015) (unpublished decision).

K.S.A. 2019 Supp. 21-5110 codifies double jeopardy protections. It provides in part:

> "(a) A prosecution is barred if the defendant was formerly prosecuted for the same crime, based upon the same facts, if such former prosecution:

16

. . . .

(3) was terminated *without the consent of the defendant* after the defendant had been placed in jeopardy, except where such termination shall have occurred by reason of:

(A) The illness or death of an indispensable party;

(B) the inability of the jury to agree; or

(C) the impossibility of the jury arriving at a verdict.

. . . .

"(f) A defendant is in jeopardy when such defendant is put on trial in a court of competent jurisdiction upon an indictment, information or complaint sufficient in form and substance to sustain a conviction, and in the case of trial by jury, when the jury has been impaneled and sworn, or where the case is tried to the court without a jury, when the court has begun to hear evidence." (Emphasis added.) K.S.A. 2019 Supp. 21-5110(a)(3) and (f).

In *Jackson*, the State initially charged Daniel Jackson with driving while suspended, but during a bench trial the district court amended the complaint to charge driving without a valid license. A panel of our court held that the amendment was in error, and thus Jackson's conviction for driving without a valid license was reversed. The *Jackson* court held that there was a de facto dismissal of the driving while suspended charge because the district court only ruled on the charge of driving without a valid driver's license. 2015 WL 9459773, at *4. Then, citing K.S.A. 2014 Supp. 21-5110(a)(3), the court concluded that "Jackson's prosecution for [the driving while suspended] charge was thus terminated without his consent after he had been placed in jeopardy, so he cannot be prosecuted again for the charge of driving while suspended based on that same incident." 2015 WL 9459773, at *4.

A similar situation played out in the *Armstead* decision, but the panel reached a different result than *Jackson* (the case was reversed and remanded for a new trial on the driving while suspended charge). *Armstead*, 2014 WL 349561, at *5-6. But *Armstead* is readily distinguishable from both *Jackson* and our case. As in *Jackson*, Armstead's appeal likewise focused on whether the defendant had been de facto acquitted of driving while

suspended by the action of the district court at trial in amending the charge to driving with no license, thus placing him in double jeopardy. But Armstead never raised before the district court or on appeal that the case was terminated before resolution *without his consent*, in violation of his double jeopardy rights. See K.S.A. 2019 Supp. 21-5110(a)(3). Obviously, the *Armstead* court could not rule on an argument never made by the defendant.

Here, as in both *Jackson* and *Armstead*, Killingsworth was initially charged with driving while suspended. In each case trials commenced, juries were impaneled, and witnesses were sworn, which meant that the defendants were placed in jeopardy. See K.S.A. 2019 Supp. 21-5110(f). The prosecutions for driving while suspended then terminated when the charges were amended to driving without a valid license. This implicates K.S.A. 2019 Supp. 21-5110(a)(3), which applies where a prosecution is terminated without the consent of the defendant after the defendant has been placed in jeopardy.

The Kansas Supreme Court has explained that "without the consent of the defendant" means "a defendant did not request the dismissal or explicitly give consent to the dismissal through his or her actions." *State v. Beerbower*, 262 Kan. 248, 255, 936 P.2d 248 (1997). Killingsworth did not request the amended complaint, nor is there any indication that he explicitly consented to the amendment through his actions.

For these reasons, we believe the proper approach is the one taken in *Jackson*. Under the circumstances, we conclude that we must reverse Killingsworth's conviction for driving without a valid driver's license and reject the State's request to remand the case for a new trial on the driving while suspended charge. The State had the opportunity to prosecute Killingsworth for driving while suspended at his trial but failed to do so. We hold that providing the State with a second opportunity would violate Killingsworth's

18

double jeopardy rights. Killingsworth's conviction for driving without a valid driver's license is reversed.

*Cumulative error*

Finally, Killingsworth argues that cumulative error deprived him of a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019).

Our analysis of Killingsworth's trial has identified two errors: (1) the prosecutor's misstatement of the law and (2) improper amendment of the complaint to charge a different crime. As we explained above, the first error is not prejudicial enough standing alone to require reversal. The issue is whether the second error contributed enough prejudice to the proceedings to deny Killingsworth a fair trial.

We conclude there is little likelihood that allowing the State to amend the complaint denied Killingsworth a fair trial on the other charges. At the time the State moved to amend the complaint, it had already presented all of its evidence. Thus, even if the State had not amended the complaint the jury would have heard the same evidence. Reversal of his conviction for driving without a valid license is a sufficient remedy for the prejudice caused by that error. Because in our opinion the prosecutor's misstatement of the law is not prejudicial enough to support reversal and because the improper amendment of the driving while suspended charge against Killingsworth did not

prejudice him as to the remaining charges, the cumulative error doctrine does not require reversal of all of Killingsworth's convictions.

Affirmed in part and reversed in part.