IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,710

STATE OF KANSAS,
*Appellee*,

v.

JASMON DEVAR WATSON,
*Appellant.*

SYLLABUS BY THE COURT

1.

It is improper for a prosecutor to attempt to shift the burden of proof to the defendant, but prosecutors are granted wide latitude to address the arguments and weaknesses of the defense.

2.

A prosecutor does not shift the burden of proof to the defendant by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding deficiencies in the State's case. Likewise, a prosecutor does not shift the burden of proof when he or she poses a general question about a lack of evidence to rebut the State's witnesses.

3.

A prosecutor falls outside the wide latitude afforded the State in conducting its case when he or she misstates the law or argues a fact or factual inference with no evidentiary foundation.

4.

An intent to defraud is an essential element of Medicaid fraud under K.S.A. 2019 21-5927(a).

5.

When evaluating a claim of cumulative error, appellate courts look to the totality of the circumstances to determine if the errors substantially prejudiced the defendant and denied him or her a fair trial.

Review of the judgment of the Court of Appeals in an unpublished opinion filed August 2, 2019. Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed April 23, 2021. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed, and the case is remanded with directions.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kristafer Ailslieger*, deputy solicitor general, argued the cause, and *Rachel L. Pickering*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.:  The State charged Jasmon Devar Watson with one count of making a false claim to the Medicaid program (i.e., Medicaid fraud), in violation of K.S.A. 2019 Supp. 21-5927(a)(1)(B), and one count of felony theft, in violation of K.S.A. 2019 Supp. 21-5801(a)(2), after discovering Watson had submitted inaccurate times sheets as part of his employment with Best Choice Home Health Care Agency, a home health-care agency enrolled with Medicaid. At trial, Watson admitted his time sheets did not accurately record the exact times of day he delivered services to Medicaid beneficiaries as a Best

Choice employee. However, Watson testified that he worked the total number of hours recorded on the time sheets and delivered all the services billed to the Medicaid program.

The jury convicted Watson of Medicaid fraud but was unable to reach a verdict on the theft charge. Based on his Medicaid fraud conviction, the district court ordered Watson to pay $13,077.22 in restitution. Watson appealed both his conviction and the district court's restitution order.

On review, the Court of Appeals found one instance of prosecutorial error and one instance of instructional error but concluded the errors were harmless and affirmed Watson's conviction. *State v. Watson*, No. 118,710, 2019 WL 3511827 (Kan. App. 2019) (unpublished opinion). But the panel vacated the restitution order, concluding it was supported by insufficient evidence. Watson petitioned for review, arguing the panel erred by affirming his conviction.

Upon thorough review of the record and the parties' briefing, we conclude the State committed two errors during closing argument. The prosecutor misstated the evidence by arguing Watson failed to provide *any* proof that he had worked the total hours recorded on his time sheets, an argument that disregarded Watson's own testimony. The prosecutor also misstated the law by arguing Watson was guilty of Medicaid fraud based solely on his submission of inaccurate timesheets, without regard to whether Watson had acted with intent to defraud. These errors substantially diminished, or effectively eliminated, an essential element of the crime of conviction—the defendant's intent to defraud Medicaid. Simultaneously, the errors undermined Watson's central defense to this charge—that he acted without intent to defraud.

The prosecutorial errors substantially prejudiced Watson and deprived him of a fair trial. An additional instructional error contributed to this prejudice. Accordingly, we reverse the judgment of the Court of Appeals, reverse the judgment of the district court based on the jury verdict, and remand the case for a new trial.

FACTS AND PROCEDURAL BACKGROUND

Between February 2013 and August 2014, Watson worked two different jobs in Kansas City, Kansas. First, he worked as a transitional living skills (TLS) assistant with Best Choice, a home healthcare agency owned and managed by his aunt and uncle. In that position, Watson provided TLS services to individuals with traumatic brain injuries to help them develop or relearn skills necessary to optimize independence and enhance their quality of life. Best Choice contracted with Medicaid to provide these TLS services to Medicaid beneficiaries. In turn, Medicaid reimbursed Best Choice for services delivered each billing cycle through a claim submission and review process. Best Choice relied on its employees' time sheets and case notes to prepare its claim submissions to Medicaid.

In addition to his job at Best Choice, Watson also worked part-time as a store clerk for QuikTrip. At the time of trial, Watson had worked at QuikTrip for six years. During this tenure, Watson worked part-time, averaging 20-25 hours per week, with no set schedule. His manager knew Watson had another job but never had to change Watson's schedule to accommodate his employment with Best Choice.

Based on Watson's dual employment, Special Agent Darren Brown in the Medicaid Fraud and Abuse Division of the Kansas Attorney General's Office launched an investigation into possible Medicaid fraud. Agent Brown collected Watson's personnel files from both QuikTrip and Best Choice, which contained QuikTrip timecards and timesheets from Best Choice. From these time entry records, the Attorney General's

4

Office had its research analyst, Cindy Ludwig, identify Watson's overlapping work hours between QuikTrip and Best Choice. Ludwig's summary showed a total of 247 instances where time reported on Watson's QuikTrip time sheets overlapped with the scheduled work hours reported on Watson's Best Choice time sheets. Assuming all overlapping hours were devoted to QuikTrip, rather than Medicaid beneficiaries, Ludwig concluded that Medicaid had been overbilled and paid fraudulent claims totaling $13,077.22.

The State charged Watson with one count of Medicaid fraud and one count of felony theft. At trial, the State presented four witnesses: Kim Reynolds, a traumatic brain injury program manager for the Kansas Department for Aging and Disability Services; Special Agent Brown; Corey Hanover, Watson's manager at QuikTrip; and Ludwig. The State also introduced Ludwig's table of overlapping hours and Watson's personnel records from his employers. The State acknowledged its case was "based on these records" showing the overlapping hours in the time sheets from Watson's two employers.

Watson took the stand in his defense. He admitted that it was not unusual for his two work schedules to overlap, and he did not disagree that it happened over 200 times, as the State alleged. However, he insisted that everyone at Best Choice knew his work schedules overlapped on paper, but the flexible nature of his duties at Best Choice allowed him to work around his QuikTrip schedule. He testified adamantly that he always worked the total number of hours documented on his Best Choice time sheet, but not necessarily during the schedule reflected in those records.

Watson explained his flexible work schedule was made possible, in part, due to the State's guidelines that restricted the amount of TLS services that could be provided to beneficiaries. Under these guidelines, TLS providers could deliver no more than 15 hours of TLS services per week and no more than 4 hours per day for any client. Thus, in any 24-hour period, Watson only had 4 hours to work with a client to assist with varying transitional living activities, skills, and goals. To illustrate how his flexible work schedule

5

operated, Watson explained he might go help one of his Best Choice clients with a morning-oriented goal, such as waking up with an alarm clock, making coffee, and starting one's day. Then, he could go to work at QuikTrip to work his scheduled hours. When his shift ended at QuikTrip, he could finish out the day reviewing and assessing daily progress with a Best Choice client. Through this flex time approach, Watson claimed he always worked the total hours reported, even though he delivered the TLS services outside the schedule reflected on his Best Choice time sheet.

Watson acknowledged that each Best Choice time sheet contained the warning, "any misrepresentation or falsification will result in Medicaid fraud and will be punishable to the full extent of the law." But Watson insisted he discussed with Best Choice the variance between the work schedule reflected on his Best Choice time sheets and the hours he actually worked outside this schedule. Watson said Best Choice never took issue with this discrepancy. Watson testified that he asked Best Choice to change his schedule to reflect the times he delivered services, but Best Choice told him changing the schedule would "throw their coordination off."

Watson also explained that Best Choice required all time sheets be accompanied by case notes. The case notes described all TLS services Watson provided to clients each day and how these services related to the clients' overall goals. Best Choice strictly enforced its case notes requirement and refused to pay TLS providers if they did not submit case notes with their time sheets. Watson's case notes were not submitted as evidence, but he testified that his clients signed off on all his time sheets to verify the total hours worked and the content of the case notes, and he never missed a paycheck for failing to provide the required case notes. Watson admitted his case notes did not itemize the hours worked with each client but did contain the total number of hours worked and other details tending to corroborate that he delivered the TLS services billed to Medicaid.

6

Following Watson's testimony, the defense rested, and the district court held a jury instruction conference. Watson objected to jury instruction No. 10, which stated:

"It is not a defense that others who participated in the commission of the crime have or have not been convicted of the crime, any lesser degree of the crime, or some other crime based on the same act."

Watson objected on the grounds that no one else had been charged with a crime. The district court overruled his objection because Watson testified that others may have been involved in the commission of a crime.

The jury convicted Watson on the first count of making a false claim to Medicaid but could not reach a verdict on the second count of felony theft. The district court sentenced Watson to probation with an underlying prison term of five months. The court also ordered restitution in the amount of $13,077.22.

On appeal, Watson claimed several trial errors. He argued the prosecutor erred during closing argument by trying to shift the burden of proof to the defense and misstating the law and evidence. He also claimed the district court committed instructional error by giving jury instruction No. 10, and cumulative error deprived him of a fair trial. Finally, he argued insufficient evidence supported the restitution order.

The Court of Appeals concluded the prosecutor did not shift the burden of proof or misstate the law during closing argument but did err by misstating the evidence. 2019 WL 3511827, at *2-6. The panel also held that the district court erred by giving jury instruction No. 10 because it was not factually appropriate. 2019 WL 3511827, at *6-8. However, the panel concluded these errors, both individually and cumulatively, were harmless. 2019 WL 3511827, at *5-6, 8-9. Finally, the panel vacated the restitution order, holding it was supported by insufficient evidence. 2019 WL 3511827, at *9-10.

Watson petitioned for review of the Court of Appeals' decision regarding his claims of prosecutorial, instructional, and cumulative error. The State cross-petitioned, challenging the Court of Appeals' decision to vacate the restitution order. We granted review of Watson's petition and denied the State's cross-petition.

ANALYSIS

*The State Committed Prosecutorial Error During Closing Argument*

Watson argues the State committed three acts of prosecutorial error during closing argument, including: (1) improperly shifting the burden of proof to him by repeatedly remarking on the lack of evidence to support his defense; (2) misstating the evidence by declaring Watson offered no proof he delivered the services charged or worked the hours reported on the Best Choice time sheets; and (3) misstating the law by arguing Watson was guilty of Medicaid fraud based solely on his submission of an inaccurate time sheet. Watson argues the Court of Appeals erred in finding only one of these claims constituted prosecutorial error and by concluding the error was not prejudicial.

*Standard of Review and Relevant Legal Framework*

We evaluate claims of prosecutorial error through a two-step process that includes both error and prejudice analysis:

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional

8

constitutional harmlessness inquiry demanded by *Chapman* [ *v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012)." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*The Prosecutor Did Not Improperly Shift the Burden of Proof onto Watson*

We first address Watson's claim that the prosecutor erred by shifting the burden of proof onto him.

It is improper for the prosecutor to attempt to shift the burden of proof to the defendant, but prosecutors are granted wide latitude to address the arguments and weaknesses of the defense. *State v Duong*, 292 Kan. 824, 832, 257 P.3d 309 (2011). A prosecutor does not shift the burden of proof to the defendant by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding deficiencies in the State's case. *State v. Williams*, 299 Kan. 911, 940, 329 P.3d 400 (2014). Likewise, a prosecutor does not shift the burden of proof by posing a general question about the lack of evidence offered to rebut the State's witnesses. *State v. Peppers*, 294 Kan. 377, 397-98, 276 P.3d 148 (2012). Moreover, "[t]he prosecutor's comment must be evaluated in context and can be mitigated by jury instructions regarding the burden of proof." 294 Kan. at 397.

During closing argument, the State repeatedly commented on the lack of evidence corroborating Watson's testimony, including the following remarks:

"He admitted he didn't always work those hours that he put down on his time sheets. He also indicated and talked a great deal about the case notes. Those case notes, he admitted, were submitted at the same time as the time sheets. There's no additional information in those case notes according to him that would give any other times or dates. He's asking you to believe that he provided those services at some other time, *but he has provided no information, no proof, no evidence* of when he provided those services. . . .

. . . .

"You also heard the testimony of Darren Brown, and he provided he was the one who issued all the subpoenas and gathered up all of this information. And I admit this case is mostly records, but all of these exhibits, this is the evidence that we have. *Mr. Watson can't provide any other written documentation* of when and how and if he provided services to these traumatic brain injured people. He testified how important those services were to them, made a world of difference or should have made a world of difference to them. That's the purpose of the program, it's to help them get out and get a job and have all the things everyone would like to have. But if they weren't getting those services or they weren't getting them at the times he said, how do we even know that [they] got those services—that they got to receive them. There's nothing in the record that would indicate that during those times when he had these overlaps that he could somehow magically work two places at once. . . .

. . . .

"He agrees that those hours are false. He claims that he provided services and that he was not allowed to change his time sheets. He also claims that he couldn't or didn't actually provide any testimony about whether or not he could change his hours at QuikTrip other than saying that they were very flexible so he could have done that at the very least. *He's provided no evidence* that he has provided or attempted to provide or could have provided services during those periods while he was working at QuikTrip and that he reported he was working for these clients.

. . . .

10

".  .  . There is no way that he could have provided services to these individuals that he said he did. He's admitted there are two hundred—that it's correct he has 247 overlaps between this time and the time that he worked at QuikTrip. He admits that's true. He admits that he put false hours on and *he can't provide and has not provided any proof* that he actually provided any services during that day that he charged for. . . .

"And it's also his statements that he was working with a very vulnerable population that couldn't tell time. He knew that. He knew they needed care, that's why he was there. He was the service transitional living service coordinator. They relied on him to make sure that they got the services they deserved and the State relied on him. That was the purpose of that program, to provide those services. Provide those services and provide proof that he actually did it is why we're here today. *And has he provided any proof that he actually provided those services? No.* All he's done is submit time sheets that 247 times overlapped with times that he was working at QuikTrip. That's our contention. That's what we're asking you to find. . . .

. . . .

"And counsel wants to say there's no evidence here. State has presented plenty of evidence. *The defendant has not.* Thank you." (Emphases added.)

Watson contends these statements shifted the burden of proof onto the defense. He also argues the prejudicial force of these statements was exacerbated by the State's cross-examination, during which the prosecutor repeatedly asked Watson if he had any evidence proving he had worked all hours reported or that Best Choice knew he worked flexible hours outside the schedule reflected in his time sheets.

After careful examination of the arguments in their proper context, we conclude the challenged comments fall within the wide latitude afforded the prosecution in discussing the evidence. Watson testified that he worked the total number of hours recorded and billed to Medicaid, but not necessarily during the schedule reflected on his time sheets. He also claimed Best Choice was fully aware of these facts. Watson also

11

claimed his case notes would corroborate this testimony. While Watson's testimony constituted lawful evidence, it was not corroborated by any other witness or exhibit. During closing argument, the prosecutor merely highlighted this fact to the jury. The prosecutor also argued Watson had neither provided any documentation to rebut the records introduced by the State (showing overlapping hours worked for his two employers), nor introduced any of the potentially exonerating evidence he described on the stand (the case notes). These statements accurately described the trial evidence.

Moreover, the prosecutor was not calling on the defense to disprove the occurrence of a crime. See *State v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004) (finding prosecutor improperly attempted to shift burden of proof when he asked: "'"[I]s there any evidence that it didn't happen? Is there any evidence that the things [the victim] told you didn't happen?"'"), *overruled on other grounds Sherman*, 305 Kan. 88. Even if Watson had worked the total number of hours reported, rather than the specific hours, that would not preclude a Medicaid fraud conviction. Instead, the prosecutor's remarks were fair comment on the strength, or lack thereof, of Watson's defense—specifically, the lack of evidence to corroborate Watson's testimony or to rebut the State's records. See, e.g., *Duong*, 292 Kan. at 832-33 (holding prosecutor's remarks about defendant's failure to present evidence of misidentification were "mere comment on the weakness of [the defendant's] defense"); *State v. Cosby*, 293 Kan. 121, 137, 262 P.3d 285 (2011) (prosecutor's comment, asking jury if it had heard any evidence that suggested witness' testimony was wrong, was within wide latitude granted prosecutors because it reflected lack of evidence to rebut the State's witnesses).

The prosecutor's comments were within the wide latitude afforded prosecutors in discussing the weaknesses of the defense. This conclusion is bolstered by the fact that the district court properly instructed the jury that "[t]he State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty."

12

Consequently, we agree with the Court of Appeals and hold the prosecutor did not impermissibly shift the burden of proof onto Watson.

*The Prosecutor Erred by Misstating the Evidence and the Law*

Watson also argues the prosecutor misstated the evidence and the law during closing. Prosecutors are afforded wide latitude to conduct the State's case and attempt to obtain a conviction. See *Sherman*, 305 Kan. at 109. But a prosecutor errs by arguing a fact or factual inference with no evidentiary foundation. *State v. Moore*, 311 Kan. 1019, 1040, 469 P.3d 648 (2020). Likewise, a prosecutor falls outside his or her wide latitude, and thus commits error, if he or she misstates the law. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

More than once during closing argument, the prosecutor asserted that Watson had not offered *any* proof that he delivered the services billed to Medicaid or worked the hours reported in his Best Choice time sheets. For example, the prosecutor told the jury, "[Watson] admits that he put false hours on and he can't provide and has not provided any proof that he actually provided any services during that day that he charged for." The prosecutor later stated, "And has he provided any proof that he actually provided those services? No."

During rebuttal, the prosecutor also made the following comments that reflected upon the crime and elements of Medicaid fraud as charged under K.S.A. 2019 Supp. 21-5927(a)(1)(B):

> "*All he's done is submit time sheets that 247 times overlapped with times that he was working at QuikTrip. That's our contention. That's what we're asking you to find.* And he was paid over $13,000 for time that he was working two places at once. And he wants

13

you to believe that he is not deceptive. He wants you to believe that he had no intent to defraud. What?

"The record is clear, and he's even admitted that each time he signed one of these time sheets he was aware of the statement *any misrepresentation or falsification will result in Medicaid fraud and will be punishable to the full extent of the law*. How many times does *an individual commit a crime and have a warning* each time they do it? *In these cases, they do*. Each time he signed off on one of these time sheets he was told don't put down false information, it could impact you, it could subject you to Medicaid fraud charges and yet he signed them, he submitted them, he attached the case notes to them." (Emphases added.)

Watson takes issue with the prosecutor's comments that he failed to provide "any proof" that he worked all hours reported, and therefore delivered all TLS services billed to Medicaid, because he testified to these facts. He also argues the prosecutor's remarks during rebuttal misstated the law by arguing Watson committed Medicaid fraud based solely on his submission of inaccurate time sheets, regardless of whether Watson had acted with intent to defraud. The State responds that these comments, when taken in context, were within the wide latitude granted to prosecutors because they were consistent with the evidence presented at trial and accurately reflected the law.

The Court of Appeals agreed with Watson that the prosecutor erred by stating Watson had not provided any proof that he worked all hours reported or delivered all services billed to Medicaid. *Watson*, 2019 WL 3511827, at *5. But the panel concluded the error was harmless because "the prosecutor's misstatement of fact did not bear on the factual issue to be decided by the jury"—that is, "whether Watson submitted inaccurate Medicaid time sheets to Best Choice." 2019 WL 3511827, at *6. As for Watson's claim that the prosecutor had misstated the law, the Court of Appeals held the statements were not improper. The panel reasoned that the prosecutor's comments regarding the warning on Watson's time sheet invited the jury to infer that Watson had intended to defraud

14

Medicaid because he had been warned against submitting false statements or misrepresentations. 2019 WL 3511827, at *5.

We agree with the Court of Appeals that the prosecutor misstated the evidence when she informed jurors there was "no proof" that Watson had worked all the hours reported or delivered all services billed to Medicaid. The prosecutor used the term "proof" to mean evidence. Watson testified to these facts, and his testimony constitutes evidence, or "proof" the prosecutor claimed did not exist. Furthermore, Watson testified that he would not have been paid if he had not submitted case notes detailing and corroborating the TMS services delivered to clients, and the evidence showed Watson never missed a Best Choice paycheck for failing to submit case notes.

However, we disagree with the Court of Appeals' holding that the prosecutor's argument did not misstate the law. During rebuttal, the prosecutor indicated Watson completed the crime of Medicaid fraud by submitting inaccurate timesheets to Best Choice, regardless of his intent in doing so. We find that these comments misstated the essential elements of Medicaid fraud, specifically the intent to defraud element.

The crime of Medicaid fraud, as charged in this case, is defined as follows:

"(1) With intent to defraud, making, presenting, submitting, offering or causing to be made, presented, submitted or offered:

. . . .

(B) any false or fraudulent statement or representation for use in determining payments which may be made, in whole or in part, under the medicaid program, whether or not the claim is allowed or allowable." K.S.A. 2019 Supp. 21-5927(a)(1)(B).

15

Under the plain language of this statute, proof that a defendant made false statements or misrepresentations to Medicaid satisfies only one element of Medicaid fraud. To secure a conviction, the State must also prove the defendant made such false statements or misrepresentations with the "intent to defraud." An "[i]ntent to defraud" means "an intention to deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter or terminate a right, obligation or power with reference to property." K.S.A. 2019 Supp. 21-5111(o). As used in this definition, "deception" means "knowingly creating or reinforcing a false impression, including false impressions as to law, value, intention or other state of mind." K.S.A. 2019 Supp. 21-5111(e).

Together, these statutory definitions demonstrate the "intent to defraud" element of K.S.A. 2019 Supp. 21-5927 requires the State to prove defendant made false statements or false representations to deceive Medicaid and induce it to pay claims in reliance on such falsehoods or misrepresentations. Whether Medicaid, in fact, pays the claim is irrelevant. K.S.A. 2019 Supp. 21-5927(a)(1)(B). Instead, the false statement or misrepresentation must be made with the intent to induce such payment.

This construction finds further support in the plain language of K.S.A. 2019 Supp. 21-5927(a)(1)(B), which requires the State prove, as an element of Medicaid fraud, that the statement or representation in question was not only "false or fraudulent," but also of the type "use[d] in determining payments which may be made . . . under the Medicaid program . . . ." This language reinforces the notion under K.S.A. 2019 Supp. 21-5111(e) and (o) that defendant's false statement or misrepresentation must be material or relevant to the claims review process and, therefore, calculated to induce payment from Medicaid in reliance on the false statement or misrepresentation. And it was up to the jury to sort that out in light of the evidence concerning the claim review process.

16

The prosecutor's argument misstated the law by informing jurors they could convict Watson based solely on the submission of time sheets containing any inaccuracy, regardless of whether he intended to defraud Medicaid in the process. Perhaps the prosecutor only intended to argue that the warning on the timesheet ("any misrepresentation or falsification will result in Medicaid fraud and will be punishable to the full extent of the law") was probative of Watson's state of mind, as suggested by the Court of Appeals panel. However, the message the prosecutor intended to communicate is irrelevant to our analysis. Instead, we must focus on the actual message communicated to jurors. See *State v. Thomas*, 307 Kan. 733, 745, 415 P.3d 430 (2018) (in analyzing prejudice, appellate courts focus exclusively on the error's impact on the verdict rather than considering the prosecutor's motivation or intent); see also *State v. Loughbom*, 196 Wash. 2d 64, 76, 470 P.3d 499 (2020) ("The prosecutor's 'reasonable intentions' are irrelevant because we do not assess a prosecutor's subjective intent when deciding whether error occurred."); *Lucas v. United States*, 102 A.3d 270, 278 n.12 (D.C. 2014) (In evaluating whether a prosecutor's comment constitutes error, the court employs an objective test and does "not consider the intentions of the prosecutor.").

And, here, the prosecutor's argument conveyed far more than some attenuated inference that Watson knew his conduct was unlawful. More directly, it provided an inaccurate and incomplete description of the elements necessary to characterize the defendant's acts as unlawful in the first instance under K.S.A. 2019 Supp. 21-5927(a)(1)(B). In her closing remarks, the prosecutor argued the warning on the Best Choice time sheets put Watson on notice that any inaccuracy in these records constituted Medicaid fraud. Thus, according to the prosecutor, each time Watson submitted a time sheet that did not accurately account for his flexible work hours, he knew or should have known he was committing Medicaid fraud. Through this argument, the prosecutor informed jurors that the warning on the time sheet was not only a cautionary notice, but also provided an accurate and

17

complete recitation of the elements of the crime. Further, the prosecutor signaled to the jury it was free to convict Watson based solely on his submission of time sheets that did not accurately report the time of day services were delivered, regardless of whether Watson intended to defraud Medicaid through such "false or fraudulent statement or representation." K.S.A. 2019 Supp. 21-5927(a)(1)(B). Of course, to convict a defendant of Medicaid fraud, the State must prove the defendant acted with such intent to defraud. The prosecutor's argument eliminated this essential element and effectively converted the crime of Medicaid fraud into a strict liability offense, contrary to the plain language of K.S.A. 2019 Supp. 21-5927(a)(1)(B).

*Prosecutorial Error Resulted in Prejudice to Watson*

Having determined the prosecutor erred in closing argument by misstating the evidence and the law, we must now consider whether those errors prejudiced Watson. In evaluating prejudice, we must determine if the State has demonstrated beyond a reasonable doubt that these errors did not affect the verdict. *Sherman*, 305 Kan. at 109.

In conducting its prejudice analysis, the Court of Appeals erred by embracing and perpetuating the same misstatement of the law advanced by the prosecutor during closing argument. The panel acknowledged the prosecutor erred by claiming Watson had not offered any proof that he worked the total hours recorded on his time sheets and delivered all services billed to Medicaid. However, it concluded this error was harmless because the jury could convict Watson of Medicaid fraud based solely on his submission of inaccurate time sheets:

> "More importantly, however, is the fact that the prosecutor's misstatement of fact did not bear on the factual issue to be decided by the jury. The jury was charged with deciding whether Watson submitted inaccurate Medicaid time sheets to Best Choice.

18

Even if the jury had believed Watson's testimony that he worked all of the hours documented in his submission on each given day, just not at the times documented on the time sheet, his inaccurate submission still meets the elements of Medicaid fraud as charged. In fact, it appears that at least some members of the jury *did* believe Watson's testimony that he actually worked the hours at a different time because the jury ultimately could not come to a consensus on the theft charge, which the State ultimately dismissed." *Watson*, 2019 WL 3511827, at *6.

Like the prosecutor's closing argument, the panel's analysis assumes that Watson's "intent to defraud" was not a relevant consideration for the jury. To the contrary, our statutory analysis confirms the defendant's intent to defraud is an essential element of the crime of Medicaid fraud. Thus, to secure a conviction, the State needed to prove not only that Watson submitted inaccurate timesheets, but also that he did so with the requisite intent to defraud. The panel's prejudice analysis fails to account for this essential element, and this omission constitutes legal error.

When all essential elements of Medicaid fraud are incorporated into the analysis, we are not convinced beyond reasonable doubt that the error did not affect the verdict. As set forth above, "intent to defraud" is an essential element of Medicaid fraud, yet the prosecutor's argument suggested this element was nonessential, if it even existed at all. Therefore, the error opened the door for the jury to convict Watson of violating K.S.A. 2019 Supp. 21-5927(a)(1)(B), without regard to all essential elements of that crime.

The prosecutor's misstatement of law not only eliminated an element of proof for the State, but also substantially undermined Watson's defense. At trial, Watson admitted his time sheets contained inaccuracies regarding the time of day services were delivered. However, his defense focused on the materiality of the inaccuracies to contest the "intent to defraud" element of the crime. Watson explained the time sheets accurately reflected the total number of hours he worked and demonstrated he delivered all services billed to Medicaid. If the jury accepted Watson's testimony, it supported a legally viable defense

19

to Medicaid fraud—that he did not "submit[]" inaccurate time sheets "[w]ith intent to defraud." K.S.A. 2019 Supp. 21-5927(a).

Although the jury could have accepted Watson's testimony that he worked the total hours he reported and still concluded his misrepresentations were intended to defraud Medicaid, the prosecutor's missteps led the jury away from considering the nuances of this element. The prosecutorial errors potentially affected the verdict in two different respects. In misstating the evidence, the prosecutor undermined Watson's core trial defense by suggesting it lacked any foundational, evidentiary support. Second, and more damaging, by misstating the law, the prosecutor suggested Watson's defense—though by no means a complete defense—was no defense at all, and the jury was free to convict him based on the submission of time sheets containing any inaccuracy, regardless of Watson's intent to defraud.

The jury's verdict contributes to concerns about the influence of these errors on the outcome of the proceedings. The jury convicted Watson of Medicaid fraud but could not reach a verdict on the felony theft charge. The felony theft charge required the jury to find Watson obtained control over Medicaid's property by deception and with the intent to permanently deprive Medicaid of that property. See *State v. Fritz*, 261 Kan. 294, 299, 933 P.2d 126 (1997) (discussing elements of felony theft). Likewise, the Medicaid theft charge required the jury to find Watson acted with intent to defraud. The Court of Appeals acknowledged that the jury's failure to reach a verdict on the felony theft charge demonstrated that "at least some members of the jury *did* believe" Watson's testimony that he had worked the total number of hours recorded in the time sheets, confirming he had delivered all services billed to Medicaid. *Watson*, 2019 WL 3511827, at *6. Yet this testimony also supported Watson's defense to the "intent to defraud" element of the Medicaid fraud charge.

20

The verdict leaves open the possibility the jury did not recognize or appreciate that defendant's intent to defraud was an essential element of Medicaid fraud. And, like the Court of Appeals, the jury may have been under the mistaken impression it "was charged" solely "with deciding whether Watson submitted inaccurate Medicaid time sheets to Best Choice" in arriving at a verdict on the Medicaid fraud charge, regardless of whether he intended to defraud the program. 2019 WL 3511827, at *6. As established above, the prosecutor's misstatement of the evidence and the law tended to contribute to this legally erroneous assumption that Watson's "intent to defraud" was not a relevant consideration in the jury's decision-making calculus. Additionally, the State's case focused on the time entry records showing overlapping hours between Watson's work schedules at QuikTrip and Best Choice. The State offered little evidence of Watson's intent to defraud Medicaid.

For these reasons, we hold that the prosecutor erred by misstating the facts and the law. These errors prejudiced Watson's right to a fair trial, and the State has not demonstrated beyond reasonable doubt that the errors did not affect the verdict in light of the entire record.

*Cumulative Error Deprived Watson of a Fair Trial*

While prosecutorial error alone entitles Watson to a new trial, Watson argues the district court committed instructional error and that the cumulative effect of these trial errors deprived him of a fair trial.

The Court of Appeals found jury instruction No. 10 was factually inappropriate because "the State failed to present 'specific evidence' at trial that Best Choice had not been convicted of Medicaid fraud, had been acquitted of Medicaid fraud, or had been convicted of some other crime based on the facts presented at trial to support a Medicaid fraud conviction against Watson." 2019 WL 3511827, at *8. Consequently, the panel

21

concluded the district court erred by giving jury instruction No. 10. Neither party challenges this finding on review. Thus, we proceed to Watson's claim that cumulative error deprived him of a fair trial.

*Standard of Review and Relevant Legal Framework*

,

When evaluating a claim of cumulative error, we look to the totality of the circumstances to determine if the errors substantially prejudiced the defendant and denied him or her a fair trial. In making this determination, "an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence." *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020) (citing *State v. Holt*, 300 Kan. 985, 1007-08, 336 P.3d 312 [2014]). No prejudicial error may be found under this rule if the evidence against the defendant is overwhelming. *Holt*, 300 Kan. at 1007-08. "If any of the errors being aggregated are constitutional, the constitutional harmless error test of *Chapman* applies, and the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome." *Thomas*, 311 Kan. at 914. Because the *Chapman* standard applies to the prosecutorial errors, we must determine if the cumulative errors here are harmless under that standard. See *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

*Instructional Error Compounded the Prosecutorial Error, Depriving Watson of a Fair Trial*

Here, the instructional error added to the prejudice arising from the prosecutorial error. Jury instruction No. 10 told the jury that "[i]t is not a defense that others who participated in the commission of the crime have or have not been convicted of the crime, any lesser degree of the crime, or some other crime based on the same act." The jury

22

could have inferred from jury instruction No. 10 that Best Choice had been convicted of Medicaid fraud or a similar crime based on the same acts that gave rise to Watson's charges. But in contrast to Watson, who signed and submitted the time sheets containing the inaccuracies, Best Choice did nothing more than pass Watson's time sheets on for payment. If the jury inferred from this instruction that Best Choice had been found guilty of Medicaid fraud for simply forwarding time sheets, such an inference would suggest that Watson certainly must be guilty for his more extensive role.

The Court of Appeals determined that the cumulative effect of the prosecutorial and instructional errors was harmless. This conclusion rested on the panel's premise that "[a]t its core, the factual issue presented for the jury to decide was whether Watson submitted inaccurate Medicaid time sheets to Best Choice," and because "Watson repeatedly admitted during his testimony that he submitted inaccurate time sheets," his admission alone supports the jury's conviction of Medicaid fraud as charged. *Watson*, 2019 WL 3511827, at *9. But again, the panel's harmlessness analysis suffers the same legally erroneous premise advanced by the prosecutor during closing argument—that Watson could be convicted of Medicaid fraud for submitting a time sheet containing any inaccuracy, regardless of his intent to defraud. For the reasons established above, this conclusion is legally erroneous.

By misstating the evidence and the law during closing argument, the prosecutor effectively negated the intent to defraud element from the jury's consideration. Further, these errors undermined Watson's central trial defense, which challenged the mens rea element of K.S.A. 2019 Supp. 21-5927(a)(1)(B). The instructional error, even if harmless in isolation, exacerbated this prejudice by suggesting Best Choice, who appeared less culpable than Watson based on the evidence presented at trial, may have been convicted of a crime arising from the same acts. As a result, we find the cumulative effect of these trial errors deprived Watson of a fair trial.

23

The Court of Appeals judgment affirming the district court is reversed, and the district court judgment based on the jury verdict is reversed and the case is remanded for a new trial.

STANDRIDGE, J., not participating.