NOT DESIGNATED FOR PUBLICATION

No. 126,276

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

COLT JAMESON CARTER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON and AMY NORTON, judges. Submitted without oral argument. Opinion filed July 26, 2024. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: Colt Jameson Carter appeals from his conviction for criminal threat arising from an incident in which Carter sent several threatening messages to his neighbor L.M. Carter first argues the State committed reversible prosecutorial error by misstating the law during its closing argument. This claim fails because when the entire argument is examined in context the State did not misstate the law.

Next, Carter contends the district court committed clear error by failing to provide the jury with a jury instruction defining "intentional conduct." Although we find that

Carter's requested instruction was both factually and legally appropriate, we are not firmly convinced, under these facts, that the jury would have reached a different verdict if the instruction had been given. Therefore, this claim also fails.

Finally, Carter believes the cumulative effect of these errors deprived him of a fair trial. But because cumulative error cannot be based on just one error, we also reject this claim and affirm Carter's conviction for criminal threat.

FACTUAL AND PROCEDURAL HISTORY

In May 2022, the State charged Carter with one felony count of criminal threat and one misdemeanor count of criminal trespass arising from an incident involving Carter's attempts to see his neighbor L.M. at her home. The facts surrounding the incident were primarily developed through L.M.'s testimony at trial.

Carter lived across the alley and catty-corner to L.M.'s home in Salina. Carter and L.M. had a brief romantic relationship, but they would still get together as friends. On May 25, 2022, L.M. was out of town attending her daughter's gymnastic event. Throughout the day, L.M. communicated with Carter over Facebook Messenger, but she stopped upon seeing a social media post Carter made.

The State then admitted several photographs of the Facebook Messenger exchange between Carter and L.M. that began around 2 a.m. Carter was eager to see L.M. once she got home from the gymnastics event. L.M. told Carter that she first needed to shower and then the two could meet if Carter did not act out of control. Carter aggressively demanded that L.M. quickly shower so that he could come over. L.M. testified she was scared to shower because she was worried that Carter would try to enter the house without her knowledge. L.M. asked Carter to wait, and Carter responded with multiple messages that

he would kill himself if she did not get in the shower. Carter then gave L.M. a deadline to shower before he would jump off a chair and hang himself by the neck.

L.M. stated she did not respond because Carter's threats to kill himself scared her. After a few minutes passed, L.M. asked Carter whether he had calmed down, to which Carter responded, "[L.M.] if you keep asking me stupid questions I'm gunna kill us both." Simultaneously, L.M. sent a message stating, "If so come over but if not I don't need anymore I'm shaking been crying." L.M. clarified she sent this message before reading Carter's message. L.M. then responded, "What the fuck" and put a "sad face emoji" on Carter's message. Carter sent several more messages threatening to kill himself, including a picture of himself with a rope around his neck. L.M. considered Carter's threats to be serious and stopped responding.

At around 2:40 a.m., L.M.'s home surveillance camera footage showed Carter jump over the back fence to L.M.'s home and walk up to her back door. Carter gestured toward the camera and knocked on the door. L.M., however, did not answer the door. Carter waited for about a minute, then jumped back over the fence and presumably went home. Because the surveillance camera shared the footage to L.M.'s cell phone, L.M. was aware Carter was at her back door. Rather than answer the door, L.M. called the police, who arrived after Carter had left L.M.'s property.

Saline County Police Officer William Dickerson responded to L.M.'s emergency call and spoke with L.M. at her home. L.M. explained to the officer that Carter had threatened to kill both himself and her. L.M. showed Officer Dickerson the messages containing the threats, and the officer took screenshots of the messages.

Officer Dickerson then went over to Carter's house to speak with him about the messages. After waiving his *Miranda* rights, Carter agreed to speak with the officer. When Officer Dickerson asked Carter about the message that he would kill them both,

3

Carter explained he had just "talk[ed] shit" and he did not intend to hurt L.M. or himself. Carter also told the officer that he believed L.M. had invited him over to her house, and he left after L.M. did not answer the door.

Ultimately, the jury convicted Carter of criminal threat, but acquitted him of criminal trespass. The district court sentenced Carter to an underlying 12-month prison sentence and imposed a 12-month probation term. Carter timely appeals.

ANALYSIS

I.   THE STATE DID NOT COMMIT PROSECUTORIAL ERROR DURING CLOSING ARGUMENT

Carter first argues the State committed reversible prosecutorial error by suggesting that the jury could convict Carter of criminal threat even if they were unsure about whether he intentionally placed L.M. in fear. The State responds that the prosecutor's comments never implied that the State did not need to prove Carter's intent to place another in fear.

Carter was not required to object at the district court to preserve his claim for reversible prosecutorial error resulting from statements made during closing arguments. This court, however, may consider the absence of an objection in its analysis of the alleged error. See *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

The appellate court uses a two-step process to evaluate claims of prosecutorial error:  error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). We must first decide whether the prosecutor's actions fall outside the wide latitude afforded prosecutors in closing statement. If they do, then it is prosecutorial error. But that does not end the inquiry. We must next determine whether the error prejudiced Carter using a

harmless error analysis. To find an error to be harmless, we must conclude that there is no reasonable possibility that the error contributed to the verdict. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

So we turn to the first step of our analysis and examine whether the prosecutor's statements constituted legal error. If they were not, we need go no further.

Prosecutors have wide latitude in crafting arguments and drawing reasonable inferences, so long as their statements accurately reflect the evidence, accurately state the law, are not intended to inflame the passions or prejudices of the jury, and do not divert the jury from its duty to decide the case based on the evidence and controlling law. *Bodine*, 313 Kan. at 406. "In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019).

Carter argues the prosecutor misstated the law during the following excerpt from the State's closing argument:

> "[H]e had just threatened to kill the both of them. And she told you that she did not take this as a joke.
>
> "Now, of course, when Officer Dickerson spoke to Mr. Colt Carter that night, he phrased it, you know, as honestly and as bluntly as possible, that he felt he was just talking shit, it was a joke, he had cleared it up. That may be his thought of the interaction between [L.M.] and himself, but that, I put to you, was not [L.M.]'s interpretation of their interactions that evening."

Carter believes these statements implied the State was not required to prove Carter intended to frighten L.M., but the State only needed to prove that L.M. perceived Carter's

message to be a threat. Thus, the prosecutor misled the jury to disregard an essential element of the crime, which ultimately prejudiced Carter's right to a fair trial.

Carter likens his case to *State v. Watson*, 313 Kan. 170, 484 P.3d 877 (2021). In *Watson*, the prosecutor told the jury during the State's closing argument that it could convict Watson of Medicaid fraud based solely on his submission of inaccurate time sheets, regardless of whether Watson acted with the intent to defraud. Because the "intent to defraud" is an essential element of the crime, the Kansas Supreme Court held that the prosecutor misstated the law and the error prejudiced Watson because it eliminated an element of proof. 313 Kan. at 180-85.

The State responds that the prosecutor made the statements in the context of anticipating Carter's defense to the criminal threat charge that the message was a joke and Carter did not intend for L.M. to interpret the message as a literal threat to kill her. We agree with the State.

When examining the full context of the State's closing argument, it is evident that the prosecutor made these comments while addressing Carter's potential defenses to the criminal trespass charge:

> "Now, the Defense is likely to argue that he indeed he was invited over, or at least he understood he was invited over. Well, he stood at the back door for at least about a minute or two, maybe even a little longer, she didn't answer. You heard her today that she knew he was at the back door. If she had invited him over she could have let him in. She didn't let him in. Because she didn't invite him over. Because he had just threatened shortly after 2:06 in the morning, and keep in mind this is about 2:38 when he's at the back door, he had just threatened to kill the both of them. And she told you that she did not take this as a joke.

"Now, of course, when Officer Dickerson spoke to Mr. Colt Carter that night, he phrased it, you know, as honestly and as bluntly as possible, that he felt he was just talking shit, it was a joke, he had cleared it up. That may be his thought of the interaction between [L.M.] and himself, but that, I put to you, was not [L.M.]'s interpretation of their interactions that evening. She definitely perceived what he was sending her to be a threat. And you can tell because earlier in the first two pages, State's 1 and State's 2, she is initially, I would argue, probably a participant in that conversation. And you even heard her tell you that, you know, initially it was if you had just let me take a shower, you know, maybe you can come over. Just got to let me take a shower, you've got to be cool. And then you see page, after page, after page of messages where she's not responding, and it's pretty clear through his words and his language that he doesn't have an ounce of patience for this and he's not being cool.

"That's why she did, that's why she did not send him a message that said, Hey, I'm out of the shower, you can come over now. That message never came. Because Mr. Colt Carter had just a few minutes ago threatened to kill the both of them. Why would you invite somebody over to your residence at about 2:30 in the morning when that person had just threatened to kill the both of you."

The prosecutor prefaced this portion of the closing argument by addressing Carter's likely defense to the criminal trespass charge. The prosecutor then recited the evidence, which showed L.M. told Carter she needed to shower, but he could come over on the condition that he act under control. Carter responded with several threatening messages, including the message that he would kill them both. The prosecutor then argued Carter's messages showed he would not act under control, and L.M. no longer wanted Carter to come over because she was scared by his threat to kill her.

So, in context, the prosecutor's statements referred to the trespassing charge—a charge that Carter was ultimately acquitted of. In contrast, during the State's rebuttal argument, the prosecutor focused entirely on the evidence that proved Carter intended to place L.M. in fear. The prosecutor recited the Facebook Messenger exchange between

Carter and L.M., and reasonably inferred that Carter intended to place L.M. in fear by sending threatening messages so that he could coerce a meeting with her.

Thus, the prosecutor's statements did not eliminate the intent element of the criminal threat charge. Rather, the prosecutor highlighted L.M.'s subjective fear to prove she had withdrawn her invitation for Carter to come over to her house. The prosecutor's closing arguments accurately reflected the evidence, accurately stated the law, were not intended to inflame the passions or prejudices of the jury, and did not divert the jury from its duty to decide the case based on the evidence and controlling law. Therefore, we find the comments fell within the wide latitude afforded to prosecutors to craft arguments and form reasonable inferences. So there was no error, and we need not move on to a harmless error analysis.

## II. THE DISTRICT COURT DID NOT COMMIT REVERSIBLE ERROR IN FAILING TO GIVE AN INSTRUCTION DEFINING INTENTIONAL CONDUCT

Next, Carter contends the district court erred by failing to define "intentional conduct" in the jury instructions consistent with PIK Crim. 4th 52.010 (2021 Supp.): "The State must prove that the defendant (committed the crime) . . . intentionally. . . . [A defendant acts . . . (with intent) when it is the defendant's conscious objective or desire to . . . do the act complained about by the State[] or cause the result complained about by the State.]."

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the issue was properly preserved for appeal; (2) determining whether, on the merits, error occurred; and (3) assessing whether the error requires reversal, in other words, whether the error can be deemed harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

8

So we turn first to preservation. Carter did not object to the jury instructions before the district court nor suggest an instruction consistent with PIK Crim. 4th 52.010. He therefore did not preserve it before the district court. But this does not prevent us from considering the merits of his claim, it simply limits our review. So we move to the second step of reviewing the merits of his claim under this limited standard.

When a party fails to object to a jury instruction before the district court, an appellate court reviews the instruction to determine whether it was clearly erroneous. K.S.A. 22-3414(3). For a jury instruction to be clearly erroneous, the instruction must be legally or factually inappropriate and the court must be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

A. *PIK Crim. 4th 52.010 was both factually and legally appropriate.*

Our review of the entire record is unlimited when deciding whether the instruction is legally and factually appropriate. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. *Holley*, 313 Kan. at 255. Neither party disputes the factual appropriateness of PIK Crim. 4th 52.010 in this situation.

So we turn to whether Carter's requested instruction was legally appropriate. A jury instruction is legally appropriate when it fairly and accurately reflects the applicable law. *State v. Broxton*, 311 Kan. 357, 361, 461 P.3d 54 (2020). We find the requested instruction was legally appropriate. In other words, it would not have been a legal error to include an instruction consistent with PIK Crim. 4th 52.010. It fairly and accurately reflects the applicable law.

So we move to our final analytical step, was failing to give the instruction clear or harmless error?

B. *We are not firmly convinced the jury would have reached a different verdict, under these facts, if the district court had added PIK Crim. 4th 52.010 to the instructions given.*

For the criminal threat charge, the district court provided the jury with this instruction:

"The defendant is charged in Count 1 with Criminal Threat. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"One. The defendant threatened to commit violence and communicated the threat *with the intent* to place another in fear.

"Two. This act occurred on or about the 25th day of May, 2022, in Saline County, Kansas.

"The term 'threat' includes any statement made by the defendant that he has already committed the act." (Emphasis added.)

Carter argues it would be reasonable to conclude that the verdict would have been different if the district court defined the mental culpable state of "with the intent" consistent with the definition provided in PIK Crim. 4th 52.010: "The State must prove that the defendant (committed the crime) . . . intentionally. . . . . [A defendant acts . . . (with intent) when it is the defendant's conscious objective or desire to . . . do the act complained about by the State[] or cause the result complained about by the State.]."

10

Carter does not dispute that the message was sent intentionally. Nor does he contend that if the jury had been provided a definition of "intentionally" the jurors could have concluded that he did send the message intentionally. He argues that the jury required a definition of "'with the intent'" and had they been given such an instruction, they would have found that he did not act "'with the intent'" to place the victim in fear.

This court, however, has held several times even if only in unpublished decisions, that a district court has no duty to instruct juries on the legal definitions of mental culpable states when those terms appear in the jury instructions. See, e.g., *State v. Collins*, No. 121,112, 2021 WL 936048, at *6-7 (Kan. App. 2021) (unpublished opinion); *State v. Trefethen*, No. 119,981, 2021 WL 1433246, at *13 (Kan. App. 2021) (unpublished opinion); *State v. Bacon*, No. 114,951, 2017 WL 2403355, at *9-10 (Kan. App. 2017) (unpublished opinion); *State v. Garrett*, No. 114,191, 2017 WL 2304450, at *3-4 (Kan. App. 2017) (unpublished opinion); *State v. Hanks*, No. 114,640, 2016 WL 4585620, at *3 (Kan. App. 2016) (unpublished opinion).

> "In general, jurors are 'expected to decipher many difficult phrases without receiving specific definitions.' The trial court should define words in an instruction only if the instructions as a whole would otherwise mislead the jury or cause it to speculate. The trial court is not required to define for the jury widely used words or those readily comprehensible by individuals of common intelligence. The test to determine if the trial court is required to define a legal term in the jury instructions rests on whether the common lay definition of the term differs from the legal definition of the term. [Citations omitted]." 2016 WL 4585620, at *3.

Previous panels have found "intentionally" to be a widely used term that holds the same legal meaning as it does in everyday jargon. We find these decisions to be persuasive. Carter does not articulate why the district court needed to define "intentionally" when a person of common intelligence is capable of easily understanding its meaning. Likewise, we are not firmly convinced, under these facts, that the jury would

have reached a different verdict if the PIK Crim. 4th 52.010 instruction had been given. Therefore, Carter has failed to carry his burden of proof that the district court erred by not instructing the jury on the definition of intentional conduct.

III.     WE CANNOT FIND CUMULATIVE ERROR DEPRIVED CARTER OF A FAIR TRIAL WHEN THERE ONLY WAS ONE ERROR

Finally, Carter argues the cumulative effect of the prosecutorial error and the jury instructional error deprived him of a fair trial.

This court may reverse a case when the totality of the circumstances show that a defendant was substantially prejudiced by cumulative errors and denied a fair trial. *State v. Alfaro-Valleda*, 314 Kan. 526, 551, 502 P.3d 66 (2022). But the cumulative error doctrine does not apply in cases such as this one where only one potential error has been identified. *State v. White*, 316 Kan. 208, 217, 514 P.3d 368 (2022). Thus, Carter's final claim also fails.

Affirmed.