NOT DESIGNATED FOR PUBLICATION

No. 125,655

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TYRE J. BROWN, a/k/a TYREE J. BROWN,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID DAHL, judge. Submitted without oral argument. Opinion filed February 7, 2025. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant, and *Tyre Brown*, appellant pro se.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and COBLE, JJ.

PER CURIAM: Tyre J. Brown appeals his convictions for aggravated kidnapping, aggravated burglary, and domestic battery, arguing insufficient evidence, instructional error, prosecutorial error, and cumulative error. Finding no reversible error, we affirm.

1

*Factual and Procedural Background*

Brown started dating the victim in this case (A.C.) in 2010. They had two children together and dated on and off for several years. By May 2021, Brown and A.C. were no longer together. The events giving rise to this case occurred in early May 2021. Those events led the State to charge Brown with aggravated burglary, kidnapping, criminal threat, theft, criminal damage to property, and misdemeanor domestic battery. The State later amended its complaint to increase the kidnapping charge to aggravated kidnapping, alleging Brown inflicted bodily harm during the kidnapping.

After the district court appointed counsel to represent Brown, he moved to dismiss counsel and to represent himself. The district court notified Brown of his rights and the risks associated with self-representation. It then granted Brown's request to represent himself at trial and later appointed an investigator to help Brown prepare for his case.

The State called A.C., her landlord (John Welborn), Brown's father (Alvin Brown), one of the two responding police officers (Robert Adams), and a print examiner (Kathryn Beckwith) as witnesses at trial.

Brown, who represented himself the entire trial, called several witnesses and cross-examined each, including his investigator (Sean Doyle) and the other officer who responded to A.C.'s emergency call (Tristin Zongker). Brown also testified. Brown submitted text messages between A.C. and himself from two days before the incident showing that Brown was planning to start work at the same place as A.C. Doyle testified that Brown and A.C.'s previous text conversations were cordial and did not suggest a turbulent relationship.

The jury submitted several questions during its deliberations and then convicted Brown of aggravated burglary, aggravated kidnapping, and domestic battery. Brown filed several posttrial motions, including a motion to arrest judgment, which the district court denied.

Brown declined an appointment of counsel for sentencing. And at sentencing, Brown made no objections to the presentence investigation report and agreed his criminal history score was A. He received a downward departure from the recommended sentence because the district court found his role as a primary parent and the way in which Brown had conducted himself throughout the trial proceedings established substantial and compelling reasons for the departure. So rather than sentence Brown to 620 months in prison, the district court sentenced Brown to 240 months in prison and 36 months of postrelease supervision.

Brown timely appeals. The district court appointed appellate counsel, who filed Brown's appellate brief. Brown later moved to remove his counsel, arguing that his attorney had failed to raise several relevant issues. Our motions panel denied that motion but allowed Brown to file a pro se supplemental brief.

*Does Sufficient Evidence Support Brown's Aggravated Kidnapping Conviction?*

Brown first claims insufficient evidence shows his guilt of aggravated kidnapping. Relying on *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976), he first argues that any confinement of A.C. was incidental to the domestic battery offense and thus failed to distinctly prove aggravated kidnapping. He also claims that the evidence did not prove "bodily harm" because it showed A.C. sustained only superficial scratches.

Before we address this issue, we summarize the competing evidence from Brown and A.C.

*A.C.'s Testimony*

A.C. recounted the incident and described her relationship with Brown. She explained that she and Brown had ended their relationship about a month before the incident. She denied that Brown had ever lived in her apartment—she lived alone. Brown stopped by her apartment a few times previously but never overnight. While they were dating, Brown's stepmother encouraged A.C. to leave Brown, but A.C. was afraid of Brown.

On May 8, 2021, Brown tried to contact A.C. by call and text throughout the day, but A.C. did not respond. She instead went to work and then to her grandmother's house to avoid Brown, who she believed was upset with her for ending their relationship. While at her grandmother's, A.C. texted Welborn that he could come to her apartment after 7 p.m. to pick up her rent payment.

When A.C. arrived at her apartment, she unlocked the door to enter and then locked it again behind her. As she placed her keys on the coffee table, she noticed that the kitchen knife that she usually kept by the door for protection was missing from the table. Unbeknownst to A.C., Brown had entered the apartment and had moved the knife to her kitchen. A.C. felt that something was off, so she turned to leave but she could not unlock the door before Brown entered the room and grabbed her.

According to A.C., Brown told her, "'Come here, bitch. I told you you can't avoid me.'" He then threw her on her couch and commanded her not to move. A.C. tried to flee but Brown grabbed her, punched her in the back of the head, and refused to let her leave.

4

She tried to flee several more times, but Brown consistently pushed her down and forced her to stay. A.C. told Brown to leave several times, but he refused. He also threatened that if A.C. did not agree to be with him, he would kill her. A.C. saw no gun during the interaction but had seen Brown carry a gun before. Brown told her that he had a gun and would use it to "blow [her] head off."

Sometime during their physical struggle, A.C. defecated herself out of fear that Brown was going to kill her. Brown was unaware of this and commanded A.C. to take her clothes off while she was on the couch. He also shoved A.C.'s chest and took her phone from her pocket. A.C. complied with Brown's order and took some of her clothes off. Brown then noticed what A.C. had done and degraded her. He also ordered her to go to her bathroom to clean herself up and said that she needed to get dressed because he was not "going to go down for a rape charge." A.C. complied and went to her bathroom and grabbed new clothes from her bedroom.

As she changed her clothes in another room, Welborn knocked on the front door. A.C. explained to Brown that Welborn was there to collect her rent money. Brown took the money from A.C. and told her to stay out of sight. He answered the door and gave Welborn the money. Welborn took the payment and started writing A.C. a receipt, per his customary practice. A.C. used this moment to escape the situation. She planned to run out the front door while Welborn was still there. To do this, she grabbed additional money from her purse and yelled to Welborn that she owed him more money than what Brown gave. As she approached the front door, Brown stopped her and partially closed the door. He told her not to "try anything or [he would] . . . kill [her]." A.C. agreed but as soon as the door opened, she fled and yelled for Welborn to call the police.

Brown later returned to A.C.'s apartment with his adult son. Brown yelled to A.C. that if she wanted her phone, she needed to retrieve it from him. Brown had looked

5

through A.C.'s phone and while yelling to her, implied that he had used her phone to send himself money. He insisted that she needed to grab the phone from him if she wanted him to stop making such payments. He also stated that he saw that A.C. had sent another person money on her phone but had not sent him or her children money. A.C. retrieved her phone and saw that Brown "Cash App'd" himself all the money that she had in her account, around $300.

A.C. called the police and Welborn stayed with her until the police arrived. The officers took pictures of A.C.'s injuries.

*Brown's Testimony*

Brown accused A.C. of having an affair, as his son, who worked with A.C., had told Brown that A.C. had an affair with her supervisor. Brown also admitted that before May 8, he had back-hand slapped A.C. across her face, which caused profuse bleeding and ruptured her eardrum. A.C. contested that Brown had hit her only once and instead described a beating, which included punching, hair pulling, kicking, and threats with a knife. Brown called his father later that evening to ask for advice because the bleeding would not stop, and he eventually took A.C. to the hospital. She lied to hospital staff about the cause of her injury—which Brown forced her to do by threatening to kill her—saying she hurt herself at work.

Brown also claimed that the reason he went to A.C.'s house on May 8 was because A.C. had "sabotaged" a job that he had secured at A.C.'s workplace. He testified that he entered A.C.'s apartment with a key that he had copied at Walmart after April 12. A.C. testified that she was unaware that Brown had a key. After Brown entered A.C.'s apartment, he removed the knife from the table to make sure A.C. did not stab him. He smoked marijuana in the spare room while waiting for A.C. to arrive. When A.C. got

6

home, Brown accused her of ruining his job opportunity. Brown denied threatening, hitting, or physically restraining A.C. in any way. A.C. never ran for the door, and he did not try to stop her from leaving. He did not have a gun or threaten to shoot her or state that he was going to "blow [her] head off."

Brown admitted that he took A.C.'s phone. He saw that she had sent her supervisor money, so he confronted her about it. He explained that he was frustrated that she had not sent money to him or their children, so he sent himself two payments from her phone. He also admitted that he had made fun of A.C. for defecating but claimed that A.C. did that as a reaction to him finding evidence of her payments to her supervisor.

Describing the final moments of the May 8 incident, Brown testified that A.C. "preplanned" her exit. He claimed that A.C. knew that her rent was $425 but handed him only $420 to give to Welborn. She then walked past him to leave, and he did not try to stop her. Brown believed that A.C. wanted to leave the situation because she did not want to discuss her relationship with her supervisor after Welborn left.

*Brown's argument about* Buggs *is misplaced.*

With those facts in mind, we address the first legal issue—Brown's contention that A.C.'s confinement, which led to the kidnapping charge, was inherent in another charged crime—domestic battery. Kidnapping is "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person" for a variety of statutorily identified reasons, including to "inflict bodily injury or to terrorize the victim or another." K.S.A. 21-5408(a)(3). "Aggravated kidnapping is kidnapping, as defined in subsection (a), when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-5408(b).

7

In *Buggs*, our Supreme Court fashioned a test that applies when a defendant is convicted under a specific subsection of the kidnapping statute, now codified in K.S.A. 21-5408(a)(2). 219 Kan. 203, Syl. ¶ 10. Under that subsection, a person commits a kidnapping by taking or confining someone with the intent "to facilitate flight or the commission of any crime." K.S.A. 21-5408(a)(2). Because confinement can be inherent in some charged crimes, *Buggs* found that an expansive reading of this kidnapping statute would allow the State to charge a person who has committed one of those types of crimes with a kidnapping on top of the underlying crime. 219 Kan. at 216.

But Brown was not charged or tried under the "facilitation" subsection of the kidnapping statute. The State's amended complaint, which Brown was tried under, charged him with aggravated kidnapping under K.S.A. 21-5408(b). It alleged that

"on or about the 8th day of May, 2021[,] . . . [Brown] did then and there unlawfully take or confine a person, to-wit: A.C. . . . , accomplished by force, threat or deception, with the intent to hold A.C. . . . to inflict bodily injury or to terrorize . . . and did inflict bodily harm upon A.C.[.]"

In line with that amended charge, the district court instructed the jury about bodily harm, not about facilitation:

"The defendant is charged in Count 3 with aggravated kidnapping. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

"1. The defendant took or confined A.C. . . . by force, threat, or deception.
"2. The defendant did so with the intent to hold A.C. . . . to inflict bodily injury on or to terrorize A.C. . . . , or another.
"3. Bodily harm was inflicted upon A.C.[.]
. . . .

8

"The State must prove that the defendant intended to hold A.C. . . . . to inflict bodily injury on or to terrorize A.C. . . . , or another. A defendant acts intentionally when it is the defendant's desire or conscious objective: 1) to do the act complained about by the State, or; 2) cause the result complained about by the State."

We thus reject Brown's assertion that *Buggs* applies.

*Sufficient evidence supports Brown's conviction.*

Brown's remaining argument on the sufficiency of the evidence supporting his conviction is that the evidence did not prove "bodily harm" because A.C. sustained only superficial injuries.

When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

Our Supreme Court recently rejected this "trivial injuries" argument in a similar case in *State v. Moore*, 319 Kan. 557, 564, 556 P.3d 466 (2024). *Moore* was not yet decided when the State submitted its appellate brief, but the State's argument on this issue provides similar reasoning for denying Brown's claim.

The Kansas Supreme Court began its sufficiency of the evidence analysis in *Moore* by identifying the plain meaning of "bodily harm" as used in the kidnapping statute:

9

"The Kansas Criminal Code does not explicitly define the term, but its meaning is not so difficult to understand. Black's Law Dictionary defines bodily harm as '[p]hysical pain, illness, or impairment of the body.' Black's Law Dictionary 861 (11th ed. 2019). And Merriam-Webster defines it as 'any damage to a person's physical condition including pain or illness.' Merriam-Webster Online Dictionary (defining bodily harm as bodily injury)." 319 Kan. at 563.

Brown argues that Kansas precedent establishes that trivial injuries generally cannot be used to establish bodily harm. The *Moore* court reviewed *State v. Royal*, 234 Kan. 218, 222, 670 P.2d 1337 (1983); *State v. Taylor*, 217 Kan. 706, 714, 538 P.2d 1375 (1975); and *State v. Brown*, 181 Kan. 375, 389, 312 P.2d 832 (1957), and found that each case had added language to the plain definition of bodily harm. 319 Kan. at 563-64. Brown supports his argument with the California cases considered in *Royal*, *Taylor*, and *Brown*.

*Moore*'s review of these decisions highlights that *Brown* first adopted its definition of bodily harm by considering legislative history and borrowing language from a California rule. *Moore*, 319 Kan. at 563. This contrasts with our general rule that when a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. See *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). *Taylor* later narrowed *Brown*'s definition to include a trivial injury exception after similarly considering legislative intent and policy implications. 217 Kan. at 714.

*Moore* also notes that although the courts in each case considered more than the plain meaning of bodily harm in reaching their decisions, each found sufficient evidence of bodily harm. See *Royal*, 234 Kan. 222-23 (finding cutting victim with knife sufficient to show bodily harm, unlike in *People v. Schoenfeld*, 111 Cal. App. 3d 671, 687, 168 Cal. Rptr. 762 [1980], where victim had scraped knee, nosebleeds, fainting, and stomach

distress); *Taylor*, 217 Kan. at 714-15 (finding throwing child into river showed intentional, hostile, and aggravated force applied outside forcible kidnapping's scope); *Brown*, 181 Kan. at 389 (recognizing rape was unnecessary, violent act not part of kidnapping and thus proved bodily harm).

Still, the *Moore* court declined to decide whether it should overrule *Royal*, *Taylor*, and *Brown*, because the evidence established bodily harm:

> "One may quibble whether our caselaw ignores the statute's plain meaning, but that is of little concern under the facts of Moore's case. We view the evidence in the light most favorable to the prosecution and hold a reasonable jury could find he caused M.M. bodily harm. There is no factual dispute she had physical injuries—she suffered abrasions and felt pain when Moore dragged her about 25 feet across pavement and grabbed her near the street. We hold sufficient evidence supports this aggravated kidnapping conviction." *Moore*, 319 Kan. at 564.

Similarly, when viewed in the light most favorable to the State, A.C.'s testimony and other trial evidence established that Brown caused her physical harm, and he thus committed aggravated battery. A.C. testified that after noticing the knife missing from her coffee table, she hurried to the door and tried to leave. But before she could unlock the door, Brown grabbed her. Brown then threatened, yelled at, and repeatedly pushed her, and hit her on her head. He threw her on the couch and prevented her from leaving. A.C. had to escape from the apartment while Welborn was there.

The State admitted pictures of A.C.'s injuries. Photos of her injuries show bruising behind her left ear where she said Brown had hit her, red marks on her arms from where he had grabbed her, and injuries to her chest. Her multiple points of injury refute the defendant's version of events—pushing her away with his arm at one point to grab her phone—and fits what A.C. says happened. Brown grabbed, then repeatedly pushed A.C.,

11

and hit her several times on her head. He threw her on the couch and prevented her from leaving.

Brown contends that A.C.'s injuries resulted from actions inherently associated with simple kidnapping, citing *Royal*, 234 Kan. at 222. We disagree. Brown did not simply grab A.C. and drag her away from the door to confine her in her apartment. Rather, he threw her on the couch, hit her on the back of her head, and repeatedly pushed her down, causing visible injuries and an uncontrolled defecation. Brown also told A.C. that he had a gun, he threatened to shoot her, and he forced her to remove some clothing while indicating that he might sexually assault her. So even under *Royal*'s analysis, Brown committed unnecessary acts of violence after the initial abduction.

Based on the evidence, a rational fact-finder could have found beyond a reasonable doubt that Brown confined A.C. with the intent to inflict bodily injury or terrorize her and inflicted bodily harm. We thus affirm the jury's decision on this issue.

*Did the District Court Err in Instructing the Jury on Aggravated Kidnapping by Not Including Language from* Buggs *Regarding Distinct Acts?*

Brown argues that even if this court finds sufficient evidence for the aggravated kidnapping conviction, the district court should have still instructed the jury to consider whether the confinement was distinct from domestic battery. He thus asserts that the district court should have modified the pattern instruction to include an explanation of the holding in *Buggs.* Under *Buggs*,

> "if a taking or confinement is alleged to have been done to facilitate the commission of
> another crime, to be kidnapping the resulting movement or confinement:
> "(a) Must not be slight, inconsequential and merely incidental to the other crime;
> "(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216

Brown acknowledges, however, that this argument is typically reviewed as a sufficiency of the evidence issue, which we have decided above. We agree. Because this argument merely rephrases Brown's insufficient evidence claim, we dismiss it based on our analysis above.

*Did the District Court Err by Not Giving the Jury an Instruction Defining "Bodily Harm"?*

Brown also asserts that the district court should have given an instruction defining bodily harm. Because he did not raise this issue in the district court, he must show clear error. See K.S.A. 22-3414(3); *State v. Waldschmidt*, 318 Kan. 633, 646, 546 P.3d 716 (2024). Also, when a party objects that an instruction was omitted, as here, the appellate court must consider whether the instructions given by the district court, considered as a whole, accurately stated the applicable law and were not reasonably likely to mislead the jury. *State v. Shields*, 315 Kan. 814, 820, 511 P.3d 931 (2022). "If so, then the district court did not err by failing to give the omitted instruction, even if that instruction would have been legally and factually appropriate. In other words, we are mindful that a party is not entitled to *every* factually and legally appropriate instruction. [Citation omitted.]" *State v. Martinez*, 317 Kan. 151, 170, 527 P.3d 531 (2023).

As with Brown's first issue on appeal, we find *Moore* nearly dispositive because the Kansas Supreme Court rejected the same argument that Brown makes under similar facts:

"Relying on his sufficiency argument, Moore believes a properly instructed jury would have acquitted him of aggravated kidnapping because bodily harm requires more than trivial injuries. But we already concluded sufficient evidence supports the bodily harm element because Moore dragged M.M. across the pavement, scraping her sides, and grabbed her near the street, causing her pain. Given that, we are not firmly convinced the outcome would have been different." *Moore*, 319 Kan. at 570.

Similarly, we have found that sufficient evidence supports the bodily harm element of Brown's conviction, so we also reject Brown's instructional error argument.

In any event, the district court's instructions, considered as a whole, accurately stated the applicable law and were not reasonably likely to mislead the jury. So Brown fails to establish reversible instructional error.

*Did the Prosecutor Err in Defining Bodily Injury During Closing Arguments?*

Brown next challenges statements made during closing arguments as reversible prosecutorial error. He claims the prosecutor misstated the law on bodily injury by giving an overly broad definition of that term.

*Standard of Review and Basic Legal Principles*

Claims of prosecutorial error are fact-specific and outcomes depend on the particulars of each case. *State v. Thomas*, 311 Kan. 905, 911, 468 P.3d 323 (2020); *State v. Sherman*, 305 Kan. 88, 110-11, 378 P.3d 1060 (2016). Brown did not object to the statements at trial. But appellate courts will review a prosecutorial error claim based on a prosecutor's statements made during closing argument without a contemporaneous objection. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021). Also, an alleged misstatement of controlling law must be reviewed on appeal, regardless of a timely

14

objection at trial, to protect a defendant's right to due process. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006). We must thus decide whether the prosecutor's statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *Sherman*, 305 Kan. at 109.

We use a two-step test to address this alleged error. We first determine whether an error occurred. *Sherman*, 305 Kan. at 109. A prosecutor commits error by misstating the law. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021). If the prosecutor committed such an error, we consider prejudice. Prosecutorial error is harmless if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *Sherman*, 305 Kan. at 109; see also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *Gunby*, 282 Kan. at 63. A deliberate misstatement thus weighs in favor of finding prejudice. See *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015) (prosecutor's statement that, in effect, asserted defendant could not rely on inconsistent defenses was misstatement of the law and impermissible); *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010) (prosecutor misrepresented burden of proof in closing argument).

Brown challenges the following statements: "Bodily injury doesn't mean gaping flesh wounds or, you know, broken bones. It just means any hurt done to the body whatsoever." We view these statements in the context of the prosecutor's broader argument regarding bodily injury:

"So the question, then, is did he do this with the intent to inflict bodily injury or to terrorize her, and the answer is yes.

"Number one, we know that she comes out with bodily injury. *Bodily injury doesn't mean gaping flesh wounds or, you know, broken bones. It just means any hurt done to the body whatsoever.* And . . . we know that A.C. ends up with some injuries. Her arms, she says it hurts, and you can see the red marks where fingers would've been where he grabs her. You'll have the pictures. You can look at them a lot closer in there.

"We know that she ends up with bruising behind that left ear, . . . right where she says that he hits her. Whacks her upside the head, hits her on the back of the head as well. She tells you he hits her several times. What can we discern his intent could be if he's hitting her while holding her there and not letting her go? It's to inflict bodily injury, or at the very least, to terrorize her, to put her in a state of terror.

"And we also cannot divorce what's going on now from what we know has happened in the past. This is the same man who when he's been mad at her, he's been accusing of cheating on him, put her in the hospital not that long before this. We know that's going through her head. She told you that. And we know he's also threatening her, threatening to kill her. What is the intent of that if not to terrorize her?

"We know that she ends up with injuries on her chest, and the defendant describes kind of pushing her away with his arm at one point to grab her phone. Does not comport with the evidence. Comports with what A.C. says happened. She keeps trying to get up off that couch and he keeps pushing her back down, hitting her back down, so we get multiple points of injury.

"You don't need to be a doctor to see that that wasn't one act. There are acute injuries there. So that goes to Number 3, then, was bodily harm inflicted? And the answer is yes. She comes out of this with bodily harm." (Emphasis added.)

Brown argues the challenged statements are inconsistent with *Royal*: "'To the extent the State relies on physical injury to the victim to demonstrate that the victim suffered "bodily harm," then those physical injuries must be more than "trivial injuries" that could result from any forcible kidnapping." See *State v. Moore*, No. 124,610, 2023 WL 4065032, at *9 (Kan. App. 2023) (unpublished opinion), *aff'd in part, rev'd in part* 319 Kan. 557, 556 P.3d 466 (2024); *Royal*, 234 Kan. 218, Syl. ¶ 7. Because the

16

prosecutor told the jury "any hurt" may suffice, Brown asserts that the prosecutor provided a "significantly lower threshold" for bodily harm than our caselaw requires.

Our Supreme Court refused to reject *Royal* and its supporting caselaw as ignoring the plain meaning of bodily harm in *Moore*. Still, the court in *Moore* implicitly criticized the reasoning in those cases that define bodily harm by using intent, or something more than the plain meaning of that phrase. Also, the victim in *Moore* suffered injuries which arguably toe the "trivial injuries" line that *Royal* created. When applying those facts in its sufficiency of the evidence analysis, the *Moore* court did not specifically find the facts met *Royal*'s standard. Instead, our Supreme Court relied on only the plain meaning of bodily harm to decide that issue. 319 Kan. at 564. *Moore* thus suggests that *Royal* is no longer controlling law for deciding bodily harm. *Moore*, 319 Kan. at 564. This court is duty bound to follow Kansas Supreme Court precedent unless there is some indication that it is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). We find *Moore* provides such an indication.

*If erroneous, the prosecutor's statements were harmless.*

But even if the prosecutor erred by not excluding trivial injuries that could result from any forcible kidnapping, we find no reason to reverse the jury's verdict. We are persuaded by the State's showing that the prosecutor's statements were harmless.

The State contends that the verdict turned on the jury's assessment of the parties' credibility, and the jury found A.C. to be more credible than Brown. The State also recounts the facts we reviewed above, which show that A.C. suffered bodily injuries that were more than trivial and were significant enough to meet *Royal*'s definition. The State also notes that Brown did not request an instruction defining bodily harm in the district court. And any error by the prosecutor's misstating the law is minor, so it likely had little,

17

if any, effect on the jury's decision. This convincingly establishes that the jury would not have reached a different verdict. We thus find no reversible error.

*Does Sufficient Evidence Support Brown's Conviction for Aggravated Burglary?*

During his opening statement and closing argument at trial, Brown suggested that A.C. was his wife, so he was allowed to be in her apartment. In his supplemental brief, Brown uses this argument to challenge the sufficiency of the evidence supporting his aggravated burglary conviction. Brown maintains that he had the authority to enter or remain in A.C.'s apartment because they were in a "common law marriage" and the residence was "marital property."

Brown does not cite facts in the appellate record to establish his common-law marriage to A.C. See Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36). And we agree with the State that regardless of any alleged marriage, the evidence shows Brown did not have the authority required by K.S.A. 2020 Supp. 21-5807(b)(1), the aggravated burglary statute.

Aggravated burglary is defined as "without authority, entering into or remaining within any . . . [d]welling in which there is a human being, with intent to commit a felony, theft or sexually motivated crime therein." K.S.A. 2020 Supp. 21-5807(b)(1). Brown does not challenge the intent element of this crime, only its "without authority" element.

Contrary to Brown's argument, our Supreme Court has stated that this statute "does not require the State to prove (or disprove) a burglar's residence. Instead, the State needs to prove the burglar lacked authority to enter or remain in the residence." *State v. Williams*, 308 Kan. 1439, 1445, 430 P.3d 448 (2018). Our Supreme Court also noted in

*Williams* that "someone with a property interest—as an owner or lessee, for example—has the right to exclude others from the property." 308 Kan. at 1445.

Brown relies on *State v. Franklin*, 280 Kan. 337, 345-46, 121 P.3d 447 (2005), finding insufficient evidence of aggravated burglary where primarily unrefuted evidence showed the defendant had authority to *enter* the residence. But that case is distinguishable. The State's complaint specifically alleged that Brown "unlawfully and without authority, enter[ed] into or remain[ed] within" A.C.'s residence. The evidence showed that A.C. rented the residence from Welborn, and her name was the only one on the lease. A.C. testified Brown did not live at her residence then or ever before. She explained that she and Brown had an on-and-off relationship, but she had never claimed that she was married to Brown. Welborn similarly testified that A.C. never mentioned being married to Brown but mentioned "something about an ex." No evidence showed that Brown had permission to enter A.C.'s home the day of the incident.

A.C. became aware that Brown had let himself in only when he appeared from the back room. Brown testified that he did not have any contact with A.C. before going to the apartment and did not have permission to enter the apartment that day. He claimed that he had a key but did not show that A.C. permitted him to have a key to her apartment or to enter whenever he wanted. Brown also admitted that he had entered the apartment that day to confront A.C. with allegations of sabotage and infidelity. A.C. also testified that she repeatedly told Brown to leave her apartment. She also tried to escape the situation.

And Brown does not refute the State's assertion that the residence does not meet the definition of "marital property" in K.S.A. 23-2801 (which Brown relies on to support his argument) because A.C. did not own the residence. The evidence showed that A.C. rented the property from Welborn. The State also notes that social guests, even those sleeping at a residence, do not have property rights in the residence. See *State v.*

*Talkington*, 301 Kan. 453, 477, 345 P.3d 258 (2015) (recognizing that social guests do not have property rights that can serve as basis for standing to object to search).

Viewing the evidence in the light most favorable to the prosecution, we find sufficient evidence supporting Brown's conviction for aggravated burglary. He without authority remained in A.C.'s dwelling while she was there, with intent to commit a felony—criminal threat.

*Did the District Court Abuse Its Discretion in Responding to a Jury Question About the Aggravated Burglary Charge?*

Brown next argues that the district court erred by its response to a jury question. The question asked whether the intent to commit the criminal threat element of the aggravated burglary charge required proof of a specific threat. The district court responded that any threat could be considered.

We review a district court's response to a jury question for abuse of discretion. *State v. Walker*, 308 Kan. 409, 423, 421 P.3d 700 (2018). We will reverse only if Brown shows the district court's response was arbitrary, fanciful, or unreasonable, or based on legal or factual error. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023).

*Additional Facts*

The State charged Brown with aggravated burglary under K.S.A. 21-5807(b)(1), alleging Brown entered or remained within a dwelling with the intent to commit a felony therein. The complaint specified that the felony alleged was criminal threat. Jury Instruction No. 4 also appropriately specified that Brown committed this crime "with the intent to commit a criminal threat." The instruction did not list the elements for criminal

20

threat but said: "The elements of criminal threat are set forth in Instruction No. 6." That instruction explained that to prove criminal threat, the State needed to show that Brown told A.C., "'[B]itch, I'll blow your fucking head off.'" Part of Brown's theory of defense during trial and closing arguments was that he had not made this or any other threat to A.C.

During deliberations, the jury submitted a question asking whether the aggravated burglary charge required proof of a specific threat or any threat: "For Count 2[,] [the aggravated burglary charge]—Does he have to have specifically said the quote from count 4[,] [the criminal threat charge] (Bitch, I'll blow your head off) to be a criminal threat—or could any of the general threats be considered criminal threats?"

The district court discussed the question with the parties. The prosecutor proposed that "any threat" could be considered for the aggravated burglary charge, although the specific threat was required for the criminal threat charge. Brown objected, arguing the jury had to consider the specific threat as stated in the instructions, and that the prosecutor's suggestion misstated the law. In response, the prosecutor argued the instruction's language was erroneous and should be corrected and that the court had the authority to do so. Over Brown's objection, the district court responded to the jury that any threat could be considered for the aggravated burglary charge.

*The response was not an abuse of discretion.*

The statute does not require proof of a specific threat to establish criminal threat. "[C]riminal threat is any threat to . . . [c]ommit violence communicated with intent to place another in fear . . . ." K.S.A. 21-5415(a)(1); see also *State v. Stevenson*, 59 Kan. App. 2d 49, 65, 478 P.3d 781 (2020) ("A 'threat' is made when the statement reveals intent to inflict physical or other harm on another's person or property."). Yet when the

21

State relies on multiple acts to support one charge, either the trial court must give a unanimity instruction to make sure all jurors agree on which of the possible criminal acts is the basis for its verdict or the State must convey to the jury the specific acts it relies on to support the charge. See *State v. Akins*, 298 Kan. 592, 618, 315 P.3d 868 (2014). And at trial, the State presented evidence of multiple threats which could be considered criminal threats. But Brown does not challenge the district court's response on this basis, so we consider such an argument to be waived or abandoned. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (issue not briefed is deemed waived or abandoned).

Brown instead claims that the district court's response deprived him of a meaningful opportunity to present a complete defense to the aggravated burglary charge, which is a constitutional violation. See *State v. Andrew*, 301 Kan. 36, 46, 340 P.3d 476 (2014). He argues that changing the instruction's elements prevented him from adequately arguing the correct elements at trial. He further contends that this error cannot be harmless because the jury acquitted him of criminal threat, which is the threat the aggravated burglary charge incorporated.

Although Brown objected to the district court's response on other grounds, he acknowledges that he raises this constitutional claim for the first time on appeal. Issues not raised below are generally precluded on appeal. See *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022). Even constitutional grounds for reversal asserted for the first time on appeal are not properly preserved. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Rule 6.02(a)(5) requires an appellant to explain why he or she failed to raise an issue below and why it should be considered for the first time on appeal. We strictly enforce this rule. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). Because Brown does not argue any exception to our preservation rule, we do not reach the merits of this claim.

*Did the Alleged Trial Errors Result in Cumulative Error?*

Cumulative error is reversible when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014). Unpreserved jury instruction issues which are not clearly erroneous may not be considered in a cumulative error analysis. *Waldschmidt*, 318 Kan. at 662.

But the cumulative error rule does not apply when, as here, there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). Brown's final claim thus necessarily fails.

Affirmed.